## LEO v. PEARCE STORES CO.
### No. 407.

District Court, E. D. Michigan, N. D.
Dec. 15, 1931.

Clark & Henry, of Bay City, Mich., for receiver.

Kendrick & Kendrick, of Saginaw, Mich., Duffy & Duffy, Gilbert W. Hand, Hubert J. Gaffney, Frank C. Patterson, and Kinnane & Leibrand, all of Bay City, Mich., and Beaumont, Smith & Harris, and Max Kahn, all of Detroit, Mich., for various claimants.

TUTTLE, District Judge.

This is the usual equity receivership suit upon a creditor's bill brought by the plaintiff, as a creditor of the Pearce Stores Company, a Michigan corporation, on behalf of all of its creditors, against the defendant corporation, for conservation, marshaling, and distribution. The proceedings herein now before the court arise from the filing and hearing of various claims against the defendant pursuant to the orders of this court, to which claims the receiver interposed objections. Evidence has been presented relative to certain of these claims, and numerous briefs have been submitted thereon. Many of these claims have been adjusted by agreement between the claimants and the receiver, and require no discussion here. The others will be hereinafter considered and disposed of. Those having the same features and involving the same questions will be discussed and decided together as belonging to the same group.

Claims for Damages from Breach of Leases.

At the time of the appointment of the receiver for the defendant corporation there were outstanding and in force a considerable number of unexpired leases covering various store premises occupied by the defendant in the state of Michigan, where the defendant was engaged in business, in which leases it was lessee. In some of these leases it was named as the lessee, and with respect to others the lessee nominally designated therein, Chain Properties, Incorporated, a Michigan corporation, was, I am satisfied and find from the evidence in this case, acting merely as agent for the defendant corporation, which was the real lessee. Shortly aft-

er the appointment of the receiver, these leases were repudiated and abandoned by the receiver, with consequent default therein by the defendant, as the latter by reason of the receivership became unable to perform any of its contractual obligations. Thereupon the lessors in said leases filed in this cause their claims against the receivership estate for the damages alleged to have resulted from this default, on the ground that it constituted an anticipatory breach of these leases.

Counsel for the receivers, in an interesting scholarly brief, contend that these claims should be disallowed for the reason that, in the absence, as here, of an express agreement for liquidated damages, damages are not recoverable for the anticipatory breach of a lease of real estate. Counsel summarize their contention as follows: "Claims for future rent and for damages for the breach of leases made with the Pearce Company may not be proved, because there can be no such thing as an anticipatory breach of a leasehold contract and such claims therefore are of such a contingent and uncertain nature as would prevent their allowance."

The decisions of the courts upon this question are in conflict. The courts of some states and of the federal courts sitting in such states deny, while in other states they sustain, the provability of such damages. There is no occasion here to analyze the various arguments and decisions presented in this connection or to determine their relative merits, because I reach the conclusion that the question involved is one of local law on which the federal court will follow the rule adopted by the courts of the particular state where the leasehold premises in question are situated. Gardiner v. William S. Butler & Co., 245 U. S. 603, 38 S. Ct. 214, 62 L. Ed. 505; Wells v. Twenty-First Street Realty Co., 12 F.(2d) 237 (C. C. A. 6); Walsh v. E. G. Shinner & Co., 20 F.(2d) 586 (C. C. A. 3); Schneider v. Springmann, 25 F.(2d) 255, 256 (C. C. A. 6). As, therefore, the property here involved is located in Michigan and the leases under consideration are Michigan leases, this court in determining this question will apply the law as established by the court of last resort of that state.

The rule in Michigan on that subject appears to have been definitely announced by the Michigan Supreme Court to the effect that, upon the breach of a lease on real estate resulting from the abandonment of such lease by a receiver for the lessee, the lessor is entitled to recover from the estate of the lessee, in the receivership proceedings, the damages caused by such breach. McGraw v. Union Trust Co., 135 Mich. 609, 98 N. W. 390, 392. In the case just cited, the court, after referring to the conflict in the authorities on this question, clearly and positively expressed its approval of the decisions upholding the provability of such damages. In the course of its opinion the court said: "The bank had the right to make the lease when it did, and had it continued in business and abandoned the premises, and the lessor, in accordance with the terms of the lease, had re-entered and relet the premises at a loss, there could be no question but the lessor would have a remedy over against the bank. The following cases —and we think they are in accord with the weight of authorities—recognize the same right in the lessor where the premises are vacated because of the insolvency of the corporation and the appointment of a receiver." The court then cites cases from New York, New Jersey, Pennsylvania, and Illinois.

This decision has never been overruled nor modified, and must be regarded as stating the law of Michigan on this subject. It was cited and followed in the case of In re Mullings Clothing Co. (C. C. A.) 238 F. 58, 63, where the court, in an elaborate and well-reasoned opinion, reached the same conclusion. In expressing its views, among other things it said: "In Pennsylvania Steel Co. v. New York City Ry. Co., 198 F. 721, 744, 117 C. C. A. 503 (1912), this Court held that, where a party to a contract puts it out of his power to perform it, there is an anticipatory breach, which gives the other party an immediate right of action for the damages which he sustains thereby, and that where one party is a corporation, its insolvency and the appointment of a receiver, who refuses to further perform, is such a disablement, and the breach dates from the receiver's appointment. In the case at bar when the directors voted to dissolve the corporation, and all the stockholders united in asking the state court to appoint a receiver under the statute to wind up its affairs, and the receiver was appointed by the court for that purpose, and he repudiated and abandoned the lease, there was in all this such a repudiation of the lease as amounted to an anticipatory breach, and such a putting it beyond the power of the corporation to perform its agreement as gave to this plaintiff an immediate right of action for damages. * * * In such a case the lessor has a right to sue for the anticipatory breach, and a right to be paid his damages out of the assets in the hands of the liquidating receiver. If that were not true, he would be rem-

ediless; the corporation being insolvent and determined to cease business and go out of existence.".

Nor is the legal situation affected by decisions denying to claims of this kind provability in bankruptcy, on the ground that they do not represent "fixed liabilities absolutely owing" at the time of the filing of the petition in bankruptcy, as required by the language of the Bankruptcy Act. As was pointed out by the United States Supreme Court in the case of William Filene's Sons Co. v. Weed, 245 U. S. 597, at page 601, 38 S. Ct. 211, 213, 62 L. Ed. 497, "When a statutory system is administered the only question for the Courts is what the statutes prescribe. But when the Courts without statute take possession of all the assets of a corporation under a bill like the present and so make it impossible to collect debts except from the Court's hands, they have no warrant for excluding creditors, or for introducing supposed equities other than those determined by the contracts that the debtor was content to make and the creditors to accept. In order to make a distribution possible they must of necessity limit the time for the proof of claims. But they have no authority to give to the filing of the bill the effect of the filing of a petition in bankruptcy so as to exclude any previously made and lawful claim that matures within a reasonable time before distribution can be made."

For the reasons stated, I reach the conclusion that these lessors are entitled to recover their damages resulting from the anticipatory breach of the leases on which their claims are based, and the contention of the receiver to the contrary must be overruled. As the argument of the receiver with respect to these claims has been confined to the question of their provability, and it does not appear that there is, or will be, any dispute between the receiver and the claimants concerning the proper measure or amount of the damages recoverable, I shall assume, until the contrary appears, that the interested parties will be able to agree on the amount of such damages, and that it will not be necessary for this court to determine such amount.

### Claims for Priority under Stock Purchase Agreement.

Claims have been filed for the recovery of certain amounts paid to the defendant in the years 1928, 1929, and 1930 by various of its employees pursuant to a written stock subscription contract, hereinafter described, on the ground that such amounts were received by the defendant in trust for the claimants and constituted trust funds, so that the claimants are entitled to priority in the repayment thereof. The receiver does not object to the allowance of these claims as general claims against the receivership estate, but disputes the allowance of any priority with respect thereto.

Each of the payments in question was made to the defendant, under its former name of Associated Knitting Outlet Company, by an employee of such company, under a written agreement entitled "Pool Participation Agreement" and providing as follows: "I hereby agree to pay to the Associated Knitting Mills Outlet Company at Bay City, Michigan, an amount equal to 10% of my monthly salary upon the 1st day of each month from December 1st, 1928 to and including November 1st, 1930; All said monies so received shall be held by the above Company and applied toward the purchase for me of Class A Common Stock of said Company in accordance with the terms and provisions as set forth below and made a part of this agreement."

The "terms and provisions" thus mentioned were, in full, as follows:

"The Board of Directors has set aside Fifty Thousand ($50,000) Dollars worth of Class A Common stock of the Company for purchase by the Managers, Department Heads and Home Office Employees at Thirty ($30.00) Dollars per share, subject to the following conditions:

"(1) The number of shares to which each member shall be entitled will depend upon the amount of salary earned by him and in the Company's hands to his credit upon November 15, 1930. It is expected that the total subscriptions and amounts paid in by Store Managers, Department Heads and Home Office Employees, will be less than the total amount of the Pool, in which case it is the intention of the Company to offer the remaining amount of stock to the Department Heads and Home Office Employees in proportion to the relative importance of each to the Company.

"(2) If the total of the amounts paid by all subscribing members exceeds $50,000, then the stock shall be allotted to the members in the proportion that the amount to the credit of each bears to the total of the amounts by all of them subscribed, and the amount paid in excess of the allotment of each will be refunded forthwith.

"(3) In the event of the death of any member prior to November 15, 1930, his legal

representative shall have the right on demand to the money so paid by the member up to the time of his death, with interest thereon at the rate of 6% per annum, or stock equal to the amount so paid.

"(4) In the event of the termination of employment of any member with the Company prior to November 15, 1930, for any reason whatsoever, then such member shall have no interest in said stock, but the Company will repay to such person the amounts so deposited by him.

"(5) None of the stock designated as "Pool Stock" shall be issued prior to November 15, 1930, except as set forth in paragraph (3) above, and no member will have any interest in any of said stock until the same is fully paid for and issued."

Whether this contract created a trust or merely a contractual debt depends, of course, upon the intention of the parties. As the rule is succinctly expressed by section 33 of the American Law Institute Restatement of the Law of Trusts, "A trust is created only if the settlor manifests an intention to create a trust." The applicable considerations are explained in the "Comment" to section 15 of the same Restatement as follows: "If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created. * * * If there is an understanding between the parties that the person to whom money is paid shall pay 'interest' thereon (at a fixed or at a current rate, and not merely such interest as the money, being invested, may earn) the relationship is practically always a debt and not a trust. Interest is paid for the use of the money, and if the payee pays interest he is, in the absence of a definite understanding to the contrary, entitled to use the money for his own purposes. It is theoretically possible of course for a trustee to pay 'interest' from his own funds, but in the absence of a clear agreement to that effect such an intention would not be found."

It will be noted that the agreement here involved provided that the payments made thereunder were to be "applied toward the purchase" of stock in the defendant company; that the number of shares to which each member shall be entitled will depend upon the amount of salary earned by him and "in the company's hands to his credit" upon November 15, 1930; and that, in the event of the death of the subscriber prior to the date specified, his legal representative would be entitled to the money theretofore paid "with interest thereon at the rate of 6% per annum." There is no reference to any trust. There is no language indicating any intention that the money shall be kept as a separate fund or that its use by the defendant shall be restricted in any way. Indeed, such restriction is negatived by the provisions relative to interest.

█ It appears that in many instances these payments were made by the deduction by the defendant of amounts due from it to the employee, instead of by the actual payment of such amounts to the defendant. The receipts given to the employees acknowledging receipt of payments recited receipt by the defendant of the particular amount as a "payment on Class A Common Stock, Pool Participation." All payments, either actually received from the employee or deducted from the amount due such employee, were credited to the stock subscription account of such employee on the books of the defendant company. There is no evidence of any agreement or intention on the part of either the defendant or of any of its employees to the effect that these payments should be held in trust or treated otherwise than as payments made toward the purchase price of the stock covered by this subscription contract. Nor did the defendant treat the amounts so paid as trust funds. Bearing in mind that the burden of proof rests upon the claimants to establish their claims of priority by sufficient evidence, and that they have failed to meet that burden, I reach the conclusion that their claims to such priority cannot be sustained. These claims are allowed only as general claims, entitled to share in the proceeds of the receivership estate ratably with other general claims. There is therefore no occasion to decide whether, even if these payments were received by the defendants as trust funds, the claimants have succeeded in tracing such funds into the hands of the receiver.

Claims of Store Managers for Bonuses.

█ Claims were filed by certain former employees of the defendant each of whom had acted as manager of one of the retail stores operated by the defendant in various communities, for the recovery of amounts to

which they claim to be entitled under their contracts of employment as commissions on the net profits of such stores for the year 1930. Each of these contracts provided for the payment, to the manager concerned, of a fixed salary, and, in addition, "a commission equal to 10% of the annual net profits of the business conducted by" such manager, payable "at the end of each year." The evidence shows that if, in determining the amount of the net profits on which these amounts were to be based for the year 1930, there be included, as the receiver contends should be done, in the operating costs, the amount of the overhead expenses of maintaining the home office of the defendant and the amount of a shrinkage found by the defendant to exist in the inventories of the various stores as compared with the inventory figures reported by these managers, there were no such net profits for that year. Although the claimants contend that these overhead costs and inventory shrinkages should not be charged against them, I am unable to discover any meritorious basis for such contention. It appears that in previous years these overhead expenses had been added to the cost at which merchandise had been billed by the defendant to these managers, but that the defendant had determined that during 1930 such merchandise would be billed at figures representing its actual net cost to the defendant and that such overhead at the end of the year would be directly and ratably charged as part of the costs of operating these stores. The merchandise was accordingly so billed throughout the year. Although the receiver herein was appointed in January, 1931, before the compilation of the final figures showing the operating results on which the 1930 commissions were to be based, clearly the receiver now stands in the shoes of the defendant in relation to these claims. After careful examination of the evidence, a review or discussion of which would serve no useful purpose, I am satisfied that the computation and allocation of operating costs for 1930 which have been made by the receiver, including the home office overhead and inventory shrinkage here in question, are proper, and that they correctly represent the expenses to be taken into account in determining whether there were in that year actual net profits of these stores on which commissions are payable under these contracts. It is undisputed that on such a basis there were no such profits. I conclude, therefore, that these claims must be disallowed. The other question argued, as to whether the services involved were within the scope of the Michigan statute (section 15930, Michigan Compiled Laws of 1929) giving priority to debts by an insolvent for "labor," thus becomes immaterial and need not be considered.

### Claim on Conditional Stock Subscription.

Claimant Lippmann Bros. seeks to recover a payment of $1,000 made by it to the defendant prior to the receivership, pursuant to a written agreement between it and the defendant whereby it subscribed to a certain amount of the capital stock of the defendant corporation at par for the total price of $5,000, on which the said payment was made. This agreement contained a clause reciting that the defendant "agrees to re-purchase the same (the stock in question) from the undersigned (the claimant) at par, within six months after notice by the undersigned that the undersigned desires said re-purchase." The claimant produced evidence to the effect that within the agreed six months it mailed to the agent of the defendant, with whom it had previously dealt relative to this same transaction, a written notice of its election to avail itself of this option. Notwithstanding the contentions of the receiver to the contrary, I am satisfied by the evidence, and I find, that such notice was in fact so given by the claimant to the said agent, and that the latter was authorized, if not expressly, at least impliedly and by being so held out, by the defendant, to represent and bind the defendant with respect to this notice.

Nor can I agree with the argument of the receiver to the effect that the enforcement of this repurchase clause of the subscription contract would be fraudulent or inequitable as to creditors or other stockholders of the defendant, under the circumstances here shown. It does not appear that at the time of the election by the claimant to resell this stock, which was approximately six months prior to the appointment of the receiver herein, the defendant was insolvent. Indeed, counsel for the receiver in one of their briefs state that "there was nothing in the condition of the Pearce Stores Company at that time to warrant a cancellation." The clause in question was, in my opinion, not a separate and independent agreement for the repurchase of this stock, but was such a condition attached to the subscription contract itself that whatever rights the defendant and its stockholders and creditors acquired from such contract against the claimant were qualified and limited in their inception by that condition. Ophir Consolidated Mines Co. v. Brynteson, 143 F. 829, 833 (C. C. A. 7). As was said by the court in the case just cited,

in language equally applicable here: "The right to so hold and own the stock remains in the corporation until an absolute sale is made. No such sale arose under the agreement in suit. It was of the well-recognized class, known as a contract of 'sale or return,' as defined in Sturm v. Boker, 150 U. S. 312, 328, 14 S. Ct. 99, 104, 37 L. Ed. 1093, where the title passes for the time being, but subject to the option of the purchaser to rescind and return the property within the time stipulated. With the exercise of the option the contract of sale terminates and the right and title of the corporation is restored to its original status. No sale has been accomplished, and no purchase or repurchase arises upon the part of the corporation through this return of its unsold stock. * * * The contention that the contract was fraudulent as to other stockholders and creditors requires no discussion, under the foregoing view that no sale of stock was effected, so that the agreement to repay the investment for purchase money, if the stock was not purchased, called for no diversion of corporate funds—plainly distinguishable from the cases cited of release of subscribing stockholders."

For the reasons stated, the contentions of the receiver must be overruled and this claim allowed as a general claim against the receivership estate. Orders will be entered in accordance with the terms of this opinion.