STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
UNITED STATES STEEL COMPANY, FORMERLY CAR-
NEGIE-ILLINOIS STEEL CORPORATION, A CORPORA-
TION OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued September 22, 1952—Decided March 16, 1953.

*Mr. R. Paul Mitchell* argued the cause for appellant (*Messrs. Stryker, Tams & Horner,* attorneys).

*Mr. George M. Eichler* argued the cause for the State (*Mr. Theodore D. Parsons,* Attorney-General of the State of New Jersey).

The opinion of the court was delivered by

WACHENFELD, J. This appeal comes up directly from the Chancery Division of the Superior Court by the granting of the appellant's petition for certification.

The State, by proper proceedings, sought to escheat certain personal property in the possession of the company consisting of (1) claims for wages, (2) claims on unredeemed cafeteria coupons, (3) claims for amounts withheld from wages of former employees for the purchase of Liberty Bonds.

The time for filing an answer was extended from time to time pending the determination by this court of the case of *State v. Standard Oil Co.,* 5 *N. J.* 281 (1950), which involved questions common to the instant litigation. On appeal to the United States Supreme Court, 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951), the judgment entered here was affirmed.

It was subsequently stipulated judgment for the company be entered as to the unclaimed wages and unredeemed cafe-

teria coupons, leaving to be determined only the question whether the sums deducted from the wages of employees for the purchase of Liberty Bonds were subject to escheat.

The pretrial order, limiting the issues, included the following: whether or not the claims for amounts withheld from wages for the purchase of Liberty Bonds were enforceable by the former employees against the company as of March 18, 1949, when the proceedings were commenced, and what the relationship was between the company and its employees with regard to the withholding. Was it trustee-*cestui que trust,* debtor and creditor, or depositor and depositary?

No testimony or evidence was offered, the parties relying upon the pleadings and the facts as stipulated.

Briefly, these indicated that prior to 1921 employees of the company subscribed for Liberty Bonds and the company purchased, with its own funds and in its own name, bonds sufficient to cover the subscriptions. Thereafter, it deducted an agreed sum from the weekly wages or salaries of the subscribing employees, upon the understanding that when the aggregate of such deductions equalled the face amount of a bond, the money so deducted would be considered as payment by the employee for the bond, which would then be delivered to him.

The amounts so deducted were not kept in a separate bank account but remained in the general funds of the company, which also kept records showing the respective amounts withheld from the wages or salaries of each employee who subscribed to the plan and by means of a separate bookkeeping account showed the aggregate of the amounts deducted. The balance of this bookkeeping account at any one time always reflected the total sums deducted less the value of bonds delivered and the sums paid to employees under the practice agreed upon. The general funds of the company always greatly exceeded the amount of this bookkeeping account.

In the instance where the company did not deliver any Liberty Bonds to an employee by reason of the fact that the total deductions from the wages or salary of said employee

did not equal the amount of the subscription, he was entitled to a return of the money paid in, without interest. ✓

It was a necessary prerequisite to the right of any person to take advantage of the plan that he be and continue to be an employee of the company. When any subscriber to the plan was entitled to the return of the deductions but could not be located by the company, the latter credited a bookkeeping account entitled "Unclaimed Liberty Loan Subscriptions" with the amounts thereof, but the funds remained unsegregated.

The trial judge concluded there was no substantial difference between the stipulated facts in this case and those in the *Standard Oil* case, *supra,* and therefore felt "obliged to follow the ruling in the *Standard Oil* case." Judgment was accordingly entered for the State and the cause certified here for disposition on appeal.

The appellant now contends all the claims for amounts withheld from wages of former employees for the purchase of Liberty Bonds were barred by the statute of limitations, *N. J. S.* 2A:14-1, long before the Escheat Act, *N. J. S.* 2A:37-1 *et seq.,* became effective. It insists the relationship between the defendant company and its former employees was always one of debtor and creditor and that any cause of action which an employee had for the return of the deductions accrued at the time he left the employ of the company. In no case did this occur later than the year 1921; hence, it is asserted the statutory period has long since run.

The State's theory is the amounts deducted constituted a trust fund held by the company for the use and benefit of the subscribers because they were to be devoted only to the specific purpose of purchasing Liberty Bonds for the employees, and the trust, it is claimed, continued until such time as that purpose had been accomplished or the moneys returned to the subscriber.

We are not impressed by the cases cited by the appellant to sustain its argument. In *Tucker v. Linn,* 57 A. 1017, 1018 (*Ch.* 1904) (not officially reported), the complainant attempted to prove she had given Linn about $1,000 and had

allowed him to deduct from her wages an additional $840 with the understanding Linn would pay her a better rate of interest on the money than she could receive by depositing it in bank. The court held, even assuming she had succeeded in proving these facts, they would establish Linn merely as a debtor and not as a trustee of the money received, saying:

"He could expend it, do with it as he pleased.. He was not to hold that money in specie as a deposit for the benefit of the complainant, who trusted him with it, in which case one kind of a trust would exist; and he was not to pay it out for her use; and he was not to invest it in securities, and then hold the securities for her, the legal title to which would be in him and the equitable title to which would be in her. He was to appropriate that money, and pay her back, either on demand or at some future time, other money, equivalent to what he had borrowed, presumably, plus interest thereon. Now, whenever you have that kind of a transaction, you have a case of legal indebtedness, and you cannot have any trust. * * * There can be no trust unless you have property held by one person for the benefit of somebody else."

The case *sub judice* is readily distinguishable on the facts. Here the company sought no loan from its employees nor promised them interest for the use of their money. It retained the funds for a particular use and for the benefit of the subscribing employees.

In *National Gypsum Co. v. J. E. Stevenson Co.*, 132 *N. J. Eq.* 58 (*Ch.* 1942), the court, in deciding whether a transaction resulted in a trust or in a debtor-creditor relationship, declared:

"The test to be applied is whether the person or corporation receiving the money acquired both the legal and beneficial ownership of it. * * *"

A stock acquisition plan offered by a corporation to its employees came under the scrutiny of the court in *Leo v. Pearce Stores Co.*, 54 *F.* 2d 92, 95 (*D. C. E. D. Mich.* 1931). The plan provided that $50,000 worth of stock be set aside by the corporation for purchase by certain employees, and the amount of stock to which each subscribing employee

would be entitled depended upon the amount of the contribution earned by him and in the company's hands on a certain day. It further provided, if a member of the plan died before the date fixed for its termination, his legal representative should have the right, on demand, to the money paid in up to the time of death, with six per cent interest.

The court found this subscription plan created only a debt and not a trust, saying:

"There is no reference to any trust. There is no language indicating any intention that the money shall be kept as a separate fund or that its use by the defendant shall be restricted in any way. Indeed, such restriction is negatived by the provisions relative to interest."

In the instant case there were no provisions for the payment of interest and there was a definite restriction on the use of the fund by the appellant. It was to be used only for the purchase of Liberty Bonds for the benefit of the subscribing employees.

*McKey v. Paradise*, 299 *U. S.* 119, 57 *S. Ct.* 124, 81 *L. Ed.* 75 (1936), and *Continental Casualty Co. v. Powell*, 83 *F. 2d* 652 (*C. C. A.* 4 1936), involved somewhat similar proceedings. In the *McKey* case a bankrupt company had maintained an unincorporated welfare association to provide insurance for its employees and deducted from the latter's wages an initial membership fee and weekly dues. It fell behind in its payments to the welfare association and, in the bankruptcy action, a trustee representing the association attempted to obtain a preference on his claim for the defaulted payments, asserting they constituted a trust fund maintained by the company for the benefit of the employees.

In the *Continental Casualty* case, a railway receivership, the claimant wrote insurance policies for employees of the railway company, premiums for which policies were paid by the railway out of periodical deductions from its employees' pay, pursuant to their authorization. Just before the receivership the railway mailed a check to the insurance com-

pany for several thousand dollars which had been deducted from wages for the payment of insurance premiums. On appointment of the receivers, the bank refused payment on the check. One of the questions to be determined was whether the amount due to the claimant was a trust to be imposed on the funds in the hands of the receiver of the railway company and thus a preferred claim.

In both cases the courts held there was merely a debtor-creditor relationship between the corporation and the insurance carrier. The funds deducted from wages in each case were not to be paid back to the employee nor was he to receive a bond or other property in equivalent amount. The company acted merely as an agent to collect the insurance premiums and pay them over to the carrier, and the claimant, as the insurer, was not the beneficiary of a trust agreement but was a creditor of the company to the extent of the premiums thus collected. In the *McKey* case the court held [299 *U. S.* 119, 57 *S. Ct.* 125]:

"The agreement of the employer to pay the association instead of the employee did not give to the employee or the association equitable title to or lien upon any part of the employer's property. The assets of the employer remained as they were before, general assets. It would be impossible to state all the circumstances in which equity will fasten a constructive trust upon property in order to frustrate a violation of fiduciary duty. * * * But the mere failure to pay a debt does not belong in that category."

And in the *Continental Casualty Company* case it was said [83 *F.* 2d 654]:

"We can find nothing connected with the transaction that in any way partakes of the nature of a trust relationship. The railway company simply owed the claimant a sum of money which it failed to pay as it failed to pay others of its creditors."

The bond subscription agreement in the case at bar was of a nature quite different from the insurance agreements entered into in the last two cited cases. Here the employee was, by the terms of his agreement, entitled either to a return of the money paid on or to a Liberty Bond of equal value,

whereas in the cited cases he was not entitled to the return of anything. Those claims were asserted by insurance carriers for money owed to them by the companies involved.

Much of the company's argument relates to and stresses the fact it did not set up any special segregated account for the purchase of Liberty Bonds but instead co-mingled the deductions in its general funds. Segregation of the moneys, it urges, is a prerequisite condition to the establishment of trust relationship and suggests this was the holding in *State v. Standard Oil Company, supra.*

 We cannot agree. The stipulated facts there, like the stipulated facts here, show no segregation of the withholdings. But segregation of funds is only one of many factors to be weighed and considered in ascertaining the true intent of the parties. [Failure to segregate the funds is not determinative of the conclusion that the relationship was debtor and creditor. The intermingling of funds in itself does not destroy a trust otherwise evidenced by the intent of the parties.]

"The mere mingling of funds which are to be devoted to a specific purpose with other funds of the depositary does not destroy the right of the true owners to claim such specific funds." *Brown v. Spohr,* 180 *N. Y.* 201, 73 *N. E.* 14, 17 (*Ct. App.* 1904).

 The true test of the relationship arises from the nature of the transaction itself and the intent of the parties involved.

"The issue of trust or no trust turns almost invariably on proof of intention since the trust arises upon mere expression of the requisite intention." *Eagle B. & L. Ass'n. v. Fiducia,* 135 *N. J. Eq.* 7, 37 *A. 2d* 116, 118 (*Ch.* 1944).

To express the requisite intention it is not necessary that the word "trust" be used. *Collins v. Lewis,* 60 *N. J. Eq.* 488 (*E. & A.* 1900).

Here the wages had been earned by the employees and were due to them at the time the withholding occurred. In effect, they were, on each payday, giving back to the company the

stipulated amount of the deduction as trustee to conserve the funds and, when sufficient had accumulated, to use them for the declared purpose of the agreement, to wit, the purchase of bonds for the use and benefit of the employees. Legal title to the funds was in the company but not the equitable title. Whatever bookkeeping or other convenience may have been served by the mingling of the employee's funds with its general funds, such unilateral action will not, standing alone, ✓ defeat the true intent of the parties. To so hold would do violence to the essence of the fiduciary relationship.

The company, under the arrangement agreed upon, was to pay no interest or other consideration to the employee on the funds retained and it was therefore not privileged to use the money for its general purposes. The employee who did not pay into the fund sufficient to purchase a bond was entitled to get back only the amount of his contributions, without interest.

The general fund in which the deductions were mingled "always greatly exceeded the amount of said bookkeeping account," permitting an inference the company did not regard the funds collected as moneys available for use for ordinary business purposes.

In the *Standard Oil* case, *supra,* unpaid wages were held to create a debtor and creditor relationship subject to the statute of limitations, but here the deductions made were for the purchase of Liberty Bonds. The moment the deductions were made they became part of a fund dedicated to a specific purpose and were held subject to the accord between the company and the subscribing employee.

"If before a declaration of trust a party be a mere debtor, a subsequent agreement recognizing the fund as already in his hands, and stipulating for its investment on the creditor's account, will have the effect to create a trust." *Hamer v. Sidway*, 124 *N. Y.* 538, 27 *N. E.* 256, 258, 12 *L. R. A.* 463 (*Ct. App.* 1891).

Under the facts presented, and in accordance with the authorities cited, a trust relationship between the company and its subscribing employees was created and the statute

of limitations did not apply to the moneys withheld for the purchase of Liberty Bonds. The funds were therefore subject to escheat by the State under the terms of the Escheat Act.

The appellant urges the allowance of a counsel fee, denied by the court below, out of the "fund in court"—the subject of the escheat.

The rule determinative of this question is set forth at length in *State v. Otis Elevator Co.*, 12 *N. J.* 1.

This was in part an adversary proceeding in which the company was endeavoring to establish its right to the fund by reason of the defense of the statute of limitations and so to defeat the State's claim. In addition, however, the company was under an obligation imposed by the court's order pursuant to the escheat statute to "disclose in its answer the specific items of personalty in its custody and control which have escheated or may be subject to escheat by the State of New Jersey under the statute set forth in the complaint and such information as it may have relating to the names and last-known addresses of persons that have or may have an interest in each of the said items of personalty."

We assume this requirement entailed an exhaustive search and study of old records reaching back over a period of many years, although there is nothing in the record detailing the effort or time expended. The order was issued upon the filing of the complaint and imposed the obligation without regard to whether or not the company's answer, to be filed subsequently, acceded to or contested the State's claim of escheat. This phase of the defendant's effort was directed toward assisting in the preparation of the State's claim as required by the statute and the order issued pursuant to it.

In these circumstances, the defendant is entitled to a counsel fee for that part of its work in the preparation of the case which was done in compliance with the court's order. We are not able on the record before us to assess the amount of the fee to be allowed as it is negative as to what was done. The apportionment, in accordance with the rule laid down, can best be determined by the court in which the services were rendered.

The judgment appealed from is reversed in so far as it denied the defendant's request for the allowance of reasonable counsel fees and disbursements within the limits herein specified, and the cause is remanded for that purpose in accordance with the views expressed in this opinion and more particularly detailed in *State v. Otis Elevator Co., supra;* and in all other respects the judgment is affirmed, without costs as to either party against the other.

Jacobs, J. (dissenting in part). I concur in the court's determination that the property escheated to the State under the act but believe that the defendant is not entitled to the payment of counsel fee therefrom. My reasons supporting the denial of counsel fees to custodians in escheat cases generally are fully set forth in my dissenting opinion in the companion case of *State v. Otis Elevator Co.*, 12 *N. J.* 1 (1953); the facts in the instant matter are more compelling than in the *Otis* case. Unlike the *Otis* case, the defendant here persisted in its claim to the property throughout the entire trial below and, indeed, in this court. Its claim has now been rejected and the State's right to the property as successor to the unknown employees has been sustained. It seems to me that whether the issue be determined under the Escheat Act or solely under *Rule* 3:54–7, the defendant has no just basis for seeking payment of counsel fee from the State's property. *Cf. State v. Otis Elevator Co., supra.*

The majority suggest that the defendant ought be compensated on the assumption that the proceeding "entailed an exhaustive search and study of old records." Under our court rules every defendant in every litigation may be called upon for records and testimony bearing on the plaintiff's claims. See *Rule* 3:16–1 *et seq.; Bead Chain Manufacturing Co. v. Smith*, 1 *N. J.* 118 (1948). Nevertheless, it is now well recognized that, in the interests of sound judicial administration, he must generally bear his own counsel fees. See *Janovsky v. American Motorists Insurance Co.*, 11 *N. J.* 1 (1952); *In re Janssen Dairy Products Corp.*, 2 *N. J. Super.* 580, 589 (*Law Div.* 1949). Furthermore, under the

majority's determination the defendant was a trustee and as such was always obligated to maintain adequate records pending transfer of the trust property to the *cestuis* or to the State as their successor under the Escheat Act. The notion that a trustee who has denied the trust, has mingled the trust property with its own and used it without charge, and has apparently neglected to maintain records for ready examination by the *cestuis* or the State as their successor, should be compensated from the trust property for counsel fees incurred by it in the course of the proceeding by the State and its contest thereof, seems to lack support in authority or considerations of justice. See *Knagenhjelm v. Rhode Island Hospital Trust Co.*, 43 R. I. 559, 114 A. 5, 9 (*Sup. Ct.* 1921).

I would affirm the judgment entered in the Chancery Division in its entirety.

WILLIAM J. BRENNAN, JR., J. (dissenting in part). I agree that the funds are subject to escheat, but would go further and affirm the judgment in its entirety because I do not think that in the circumstances of this case the defendant is entitled to an allowance of counsel fees and costs. I see no reason for insisting that the question of such allowances under this statute should be determined exclusively by reference to *Rule* 3:54–7. I think, with Mr. Justice HEHER and Mr. Justice JACOBS, that in this instance we should look to the statute to determine whether the Legislature has authorized the allowance of counsel fees and costs to the custodian of the escheated property. I incline to the reasoning of Mr. Justice JACOBS in Point II of his dissent in *State v. Otis* that if allowances to a custodian of the escheated property can in any case be governed by rule of court, as a matter of judicial restraint the *Winberry* [*Winberry v. Salisbury*, 5 N. J. 240] doctrine should not be invoked to bar legislative action on the subject. I part from Justices HEHER and JACOBS, however, in their interpretation of the Escheat Act as omitting any provision for the payment of fees and costs to the custodian. I think such payments are expressly provided for by the provision direct-

ing the State Treasurer to pay, in addition to the allowances specifically mentioned, "such other fees and costs as the judgment shall direct." *N. J. S.* 2A:37–21. But certainly the trial court could not properly make an allowance to this custodian whose aid to the State was merely responsive to the coercive force of a court order and whose primary effort was to sustain a claim that the property was its own, to which end it resisted at every step of the litigation the State's effort to secure it. The statute plainly contemplates the payment of compensation only to a custodian whose participation in the case is purposed to further and not to frustrate the objective of the State's suit.

HEHER, J. (dissenting in part). I would affirm the judgment in its entirety.

I would not allow counsel fees, for the reasons stated in my dissenting opinion in *State v. Otis Elevator Co.*, 12 *N. J.* 1, and the dissenting opinion delivered by Mr. Justice JACOBS in this case.

*For modification*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD and BURLING—4.

*For affirmance*—Justices HEHER, JACOBS and BRENNAN —3.