486 F.2d 519
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of INDIANA HARBOR BELT RAILROAD COMPANY, in No. 72-1436.
Appeal of MEMBERS OF THE COMMITTEE OF INTERLINE RAILROADS et
al., in No. 72-1437.
Appeal of LOUISVILLE AND NASHVILLE RAILROAD COMPANY, in No. 72-1438.
 Nos. 72-1436 to 72-1438.
 United States Court of Appeals,
Third Circuit.
 Argued April 26, 1973.
Reargued Before the Court En Banc May 23, 1973.
Decided Oct. 9, 1973.
 
 W. Charles Hogg, Jr., Edward C. Toole, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., William R. Glendon, Frederick W. R. Pride, William J. O'Brien, II, George W. Brandt, Jr., Royall, Koegel & Wells, New York City, for appellants.
 Paul R. Duke, Philadelphia, Pa., Richard R. Bongartz, Westport Harbor, Mass., for appellees.
 Before VAN DUSEN, ALDISERT and ROSENN, Circuit Judges.
 Before VAN DUSEN, ALDISERT ADAMS, GIBBONS, ROSENN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 The primary issues raised on this appeal are (1) whether freight and passenger revenues earned by railroad carriers for interline transportation or services but collected by Penn Central Transportation Company (Penn Central) in their behalf are held by it as trust funds, and (2) whether other interline services performed and expenses incurred by the interline carriers for Penn Central prior to its reorganization, are entitled to current payment or offset. The district court in the Penn Central reorganization held that the interline railroads[1] (Interlines) were not entitled to current payment of their claims from the debtor or to a declaration of an equitable lien or priority. In addition, the court enjoined them from setting off these amounts against corresponding claims of Penn Central. In reviewing this order we are compelled to examine the complex accounting procedures of our national railroad systems and apply traditional principles of equity and trust law to the operating relationships among the railroads. We affirm in part and reverse in part.
 
 I. THE BACKGROUND
 
 2
 The district court has succinctly described the system of accounts of interline railroads in its Opinion and Order No. 613, 340 F.Supp. 857 (E.D.Pa. 1972) as follows:
 
 
 3
 The nation's railroads function in many ways as a single system. For example, a shipper or receiver pays one railroad for services of carriage for the entire shipment, although the shipment may travel over many different railroads; a railroad car may travel over the lines of many different railroads, and be used by each of them, before it again returns to the possession of the owning railroad; and a shipper whose freight may have been damaged in shipment by one of several carriers may apply to any of them for payment of his claim. The railroads have created a system of accounting and periodic settlement of accounts to facilitate this manner of operation. The accounting for various types of rail service rendered to the public or to other railroads results in "interline accounts," and the striking of balances between the railroads with respect to these interline accounts results in "interline balances." Each of the accounts is settled separately; there is no netting of the balances in different accounts.[1]
 
 
 4
 The methods of accounting and payment for interline services, however, are not controlled by statute but by industry accounting practices and rules.
 
 
 5
 The two basic categories of accounts here in issue are: (1) freight and passenger accounts; (2) other accounts, including (a) car repair accounts, (b) overcharge and loss and damage accounts, (c) per diem accounts, and (d) switching accounts. The accounting rules, described below in greater detail, differ for each of the categories. Basically, as to the first category, either the destination or the originating carrier collects the sums earned by each of the interline railroads and then allocates the appropriate amounts. As to the other accounts, the railroad that performs the service collects the amounts due it from the appropriate carrier.
 
 
 6
 Penn Central filed its petition for reorganization under section 77 of the Bankruptcy Act on June 21, 1970. In Order No. 1, approving the petition, entered on the same day, the court in paragraph 3(B) authorized Penn Central "in its discretion" to pay all interline accounts.[2]
 
 
 7
 On June 24, 1970, one of the interline carriers, Burlington Northern, Inc., petitioned the district court to require Penn Central to pay interline accounts and balances.[3] At a hearing on July 1, 1970, Charles S. Hill, Penn Central's Vice-President-Comptroller, explained that Penn Central incurs an average net liability for interline charges of $24 million per month, owing $41 million and earning $17 million. On accounts stated in June 1970 which remain unpaid and are here in issue, he said it owed approximately $32.8 million, representing services performed in April and May 1970, and earlier.
 
 
 8
 Mr. Hill also endeavored to explain Penn Central's plans as they related to interline accounts. He described Penn Central's cash forecast for the month of July and, when asked whether interline balances had been provided for, replied:
 
 
 9
 We have made provision on the expectation with the approval of the Court for meeting all of the interline accounts to be presented after or scheduled to be presented after June 30.
 
 
 10
 He explained that these payments would reflect services performed in June 1970 and earlier and that payment on them would begin July 23.
 
 
 11
 At the conclusion of the hearing, the court invited the parties to submit an order making mandatory the payment of charges stated "from and after" July 1, 1970. Order No. 9, drafted by the parties, was entered the same day. It ordered the payment of all interline accounts first stated or presented on or after July 1, 1970.[4] It also specifies that it does not prejudice the right of the Interlines to claim priority for interline accounts stated prior to July 1.
 
 
 12
 A controversy subsequently arose when the Interlines attempted to set off the interline balances they owed Penn Central against amounts owed them by Penn Central. Consequently, on June 24, 1971, the trustees petitioned the court to order that the Interlines pay all balances due. The trustees alleged that the Interlines had failed to honor drafts drawn by Penn Central in total amount of $413 million representing pre-bank-ruptcy interline balances such as claims for May 1970 freight services.[5] They contended that this violated Order No. 1, paragraph 10, providing:
 
 
 13
 All persons, firms and corporations . . . holding for the account of the Debtor deposit balances or credits be and each of them hereby are restrained and enjoined from selling, converting or otherwise disposing of such collateral, deposit balances or other credits or any part thereof, or from offsetting the same, or any thereof, against any obligation of the debtor, until further order of this court.
 
 
 14
 The Interlines defended and counterclaimed, alleging that they were entitled to offset amounts they owed Penn Central against amounts Penn Central owed them. They also alleged that Penn Central held in trust for them (a) amounts collected in their behalf for interline freight and passenger services and (b) amounts they paid on Penn Central's behalf for overcharge and loss and damage claims. In addition, they argued that Penn Central's assets should be impressed with an equitable lien for such amounts. In counterclaiming, they further alleged that Order No. 9 required Penn Central to pay immediately unpaid interline balances which would become subject to draft in July and represented pre-June 20 car repairs, passenger receipts, and services and supplies.
 
 
 15
 The district court ruled in favor of the trustees and entered Order No. 613 enjoining any further setoffs. The Interlines appeal that order. They argue (1) that Penn Central holds in trust balances arising from freight and passenger services rendered by the Interlines; (2) that other interline accounts must be paid because the Interlines are compelled by law to perform these services; and (3) that Order No. 9 requires the payment of May 1970 car repair charges and passenger balances which become subject to draft in July.
 
 II. FREIGHT AND PASSENGER ACCOUNTS
 
 16
 Freight and passenger charges are collected by the originating or destination carrier for services performed by the Interlines. Under the AAR rules, instead of separately paying each carrier that participates in an interline shipment, the shipper pays all freight charges to either the originating carrier when the shipment is "prepaid" or to the destination carrier on "collect" shipments. Funds collected are deposited in the collecting carriers' general accounts. The interline railroads make numerous collections for each other daily which are segregated and settled monthly. No interest is paid by the collecting carrier for the period it holds another carrier's revenue.
 
 
 17
 The destination railroad is responsible for preparing and settling interline freight accounts. It prepares an "abstract" on which the appropriate freight charges are allocated to the participating carriers. It then "not later than the eighteenth of the succeeding month" sends copies of the abstract to the other carriers.[6] The carriers may then immediately draw a draft on the destination railroad for the net balance due for the month. The destination carrier must include in the monthly accounting all charges for which the destination carrier has received a waybill, whether or not the shipper paid. The waybill is issued by the originating carrier and prescribes the movement of the shipment and charges. The charges which Penn Central has not paid in the instant case represent May 1970 freight services; Penn Central declined drafts submitted on or after June 22, 1970, of approximately $15 million for these accounts.
 
 
 18
 Passenger accounts are handled similarly. The monthly reports, however, are not required until the last day of the first month following the service. Net passenger balances also are subject to immediate draft upon receipt of the statements. Penn Central has declined drafts submitted on or after July 1, 1970, for approximately $280,000 for May traffic.
 
 
 19
 The AAR interline accounting system is in essence, therefore, a system by which one railroad collects monies owed by shippers to both itself and other railroads. The monies collected belong only in part to the collecting railroad; as to monies owed other railroads, the collecting railroad serves merely as a receiving and transmitting agent. A common sense interpretation of this system would indicate that funds collected by one railroad for and in behalf of another railroad are held in trust by the collecting railroad until the monies are transmitted. Whether the money is held in trust must be determined, however, not merely by reliance on common sense, but also by application of traditional legal doctrines. We therefore turn to the law of trusts to make that determination. In applying the law of trusts, it will be necessary to examine the manifestation of intent of the parties, not only in terms of written documents, but also in terms of the conduct of the parties. Especially important in the present case are (1) the absence of any payment of interest on monies collected during the time they are held by the collecting railroad, and (2) the commingling of the monies with general funds by the collecting railroad.
 
 
 20
 Accommodating and applying traditional common law trust principles to the unique regulatory scheme and accounting policies used by the nation's railroads, we have concluded that transportation and freight charges, when collected, are held in trust for the Interlines. They are therefore entitled to have their monies.
 
 
 21
 A trust is defined in Restatement (Second) of Trusts Sec. 2 (1959) as:
 
 
 22
 [A] fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.
 
 
 23
 The parties' manifestation of intention ultimately controls whether or not a trust relationship exists, but failure to expressly designate the relationship as one of trust does not necessarily negate its existence. See United States v. Orsinger, 138 U.S.App.D.C. 403, 428 F.2d 1105, 1112 (1970); Del Drago v. Commissioner, 214 F.2d 478, 480 (2d Cir. 1954); State v. United States Steel Co., 12 N.J. 51, 95 A.2d 740, 744 (1953); 1 A. Scott, Law of Trusts Sec. 2.8 (1967). When the language of the parties fails to clearly indicate their intention, it may be ascertained by other objective manifestations of intent, such as the facts and circumstances surrounding the transaction and the relationship of the parties. Stratford Financial Corp. v. Finex Corp., 367 F.2d 569, 571 (2d Cir. 1966); In re Chicago Express, Inc., 222 F.Supp. 566, 572 (S.D.N.Y.1963); 1 A. Scott, supra, Sec. 12.2, at 108.
 
 
 24
 A significant fact in the instant case warranting careful consideration is the absence of any provision for the payment of interest by the collecting carrier. Although not conclusive, its absence indicates the presence of a trust relationship. See United States v. Orsinger, supra; State v. Atlantic City Electric Co., 23 N.J. 259, 128 A.2d 861, 865-866 (1957); State v. United States Steel Co., supra. A debtor-creditor relationship entails the right to use another's money, the usual quid pro quo for which is the obligation to pay interest. See 1 A. Scott, supra, Sec. 12.2, at 108. Conversely, the collection by Penn Central as an agent of money due and owing the other railroads suggests a trust. See, e. g., In re Chandler Insurance Agency, Inc., 92 F.Supp. 878 (D.Md. 1950); National Indemnity Co. v. American National Bank, 120 F.Supp. 713 (D.Minn.1954), aff'd, 222 F.2d 513 (8th Cir. 1955); Restatement (Second) of Trusts Sec. 12, comment h (1959).
 
 
 25
 On the other hand, appellee trustees argue forcefully that the Interlines, by permitting Penn Central to commingle monies due them with Penn Central's general revenues, established a debtor-creditor relationship and not a trust. While generally commingling indicates a debtor-creditor relationship and not a trust, it is only one indicium and it too is not necessarily conclusive. See National Bank v. Insurance Co., 104 U.S. 54, 68, 26 L.Ed. 693 (1881); MacBryde v. Burnett, 132 F.2d 898, 900 (4th Cir. 1942); State v. United States Steel Co., 12 N.J. 51, 95 A.2d 740, 744 (1953).
 
 
 26
 Commingling of monies has minimal significance in the extraordinary operations of interline railroads. That Penn Central is not, as a destination carrier, required by the other carriers to immediately segregate funds collected does not necessarily reflect any intention to establish a debtorcreditor relationship in the face of the unique and complex interline railroad system. Normal operation conditions with innumerable daily collections of various categories preclude practically and economically any effective daily segregation. Burlington Northern Railway alone has more than 1300 stations from which waybills are issued.[7] This is not a simple situation of one party receiving money clearly designated as payment for services performed by another. When a carrier collects funds for another railroad, it does not immediately know what portion of the revenues collected is to be allocated to other carriers.
 
 
 27
 Mr. Hill, Penn Central's Vice-President-Comptroller, testified that Penn Central settles regularly with more than 300 interline carriers. Settlement involves calculating amounts due each carrier for many different waybills sent daily to Penn Central. We recognize the enormous difficulties confronting the destination carrier to correlate each of these waybills with payments received on a monthly basis, not to mention daily basis, and to segregate funds received according to the waybills.
 
 
 28
 AAR rules merely serve to evidence the necessities of the situation. To accommodate the carriers in this exceedingly voluminous and complicated accounting system, the AAR rules require that the statements be rendered only once each month and give the carriers 18 days to prepare the abstract of the interline freight accounts after the end of the month in which the waybill is received. The rules also indicate the difficulty in segregation of collections. They require that accounts may be drawn on the collecting carrier after the specified period even though in some instances the charges have not yet been collected from the shippers.[8]
 
 
 29
 Each party in this controversy finds support for its position in a number of cases that specifically concerned interline accounts. Although we think none are directly in point with this case,[9] none rebut our conclusion that the freight and transportation collections are held in trust.
 
 
 30
 In Southern Railway Company v. United States, 306 F.2d 119 (5th Cir. 1963), the court refused to accord priority to interline claims of the Southern Railway against the receiver of the Tallulah Falls Railway Company for amounts earned by Southern or paid by Southern to other carriers and collected by the receiver. According to the court, the freight payment first became in arrears in June 1958, and the receiver repeatedly advised Southern that it was unable to make the payments. Nonetheless, Southern made no demand for segregation of monies collected for it until May 1960. The court declined on a "laches" theory to accord the interline claims priority. It reasoned that Southern knew of the precarious financial situation of the railroad in receivership but continued to disburse its own funds to prior connecting carriers "with a full awareness that the funds were not being reimbursed by the Receiver and that, as with routine day-to-day operating charges, the Receiver was using its money, its supplies, and its facilities on which to run the Railroad." Id. at 125.
 
 
 31
 The Interlines in this case, however, were not guilty of such folly. They began demanding payment within three days of filing the reorganization petition. Southern Railway, moreover, does contain dictum indicating that, aside from the laches problem, the court indicated the funds collected acquired a trust character at the time the accounts were presented.[10] The court stated:
 
 
 32
 The Receiver had a right to collect and to retain. The duty to remit was limited to the balance when and as struck in the periodic settlements. Only then did funds, rightfully collected and mingled, acquire a "trust" character.
 
 
 33
 306 F.2d at 125. Applying this statement to the case sub judice, the freight accounts for the month of May 1970 acquired a trust character when stated on June 18, 1970.
 
 
 34
 In re Chicago Express, Inc., 222 F.Supp. 566 (S.D.N.Y.1963), aff'd, 332 F.2d 276 (2d Cir. 1964), cert. denied, 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964), involved a claim by the Pennsylvania Railroad Company for priority in the bankruptcy of a trucking company. By agreement, Pennsylvania carried trailers of the motor carrier "piggyback" on flat cars. Pennsylvania's charges for this service depended on several variable factors, including the number of trailers transported during a given month, the weight of the trailers, and the distances traveled. The railroad's charges were not related to the trucker's charges to its customers; the Pennsylvania made no inquiry into customer charges. The trucking company was obligated to pay within 15 days from the date of billing by Penn Central. This 15-day period was referred to by the parties in their rate agreement as a "credit accommodation" and was subject to suspension if payment was not timely. In rejecting the Pennsylvania's argument that proceeds received by the trucker from its shippers to the extent attributable to "piggy back" hauls constituted trust funds held for Pennsylvania, the court explained,
 
 
 35
 The following are some of the facts which lead me to conclude, as did the Referee, that the relationship between the parties here was one of creditor and debtor, and not trustee and beneficiary: the absence of an agreement between the Pennsylvania and the Debtor to apportion total charges; the lack of relationship between the amount due the Pennsylvania from the Debtor and the overall charge made by the Debtor to its customer; the unconditional duty of the Debtor to pay freight charges to the Pennsylvania within fifteen days from the day of billing, and the "credit accommodation" clause in the "divisional sheet."
 
 
 36
 222 F.Supp. at 572.
 
 
 37
 These facts in Chicago Express clearly differentiate it from the case sub judice. Penn Central did have an arrangement with the Interlines to apportion total charges; the amounts received by the Interlines were directly related to and dependent upon charges paid by shippers; and the amounts owed to the Interlines were payable immediately upon striking the monthly settlement.
 
 
 38
 Penn Cental argues, however, and the district court agreed, that this issue was previously settled in In Re Central Railroad of New Jersey, 273 F.Supp. 282 (D.N.J.1967), aff'd per curiam, 392 F.2d 589 (3d Cir. 1968). It is true that in that case the district court held that the New York Central Railroad Company (NYC) could not set off amounts it owed the Central Railroad of New Jersey (Central) for post-reorganization freight transportation against amounts owed by Central to it for pre-reorganization freight transportation by NYC. In reaching that result, the court concluded that the amounts collected by Central for NYC's interline service were not trust funds. 273 F.Supp. at 288. We affirmed by a per curiam opinion. To the extent the Central Railroad decision is inconsistent with the case sub judice, it should not be followed.
 
 
 39
 The concurring opinion expresses concern because of our reliance upon established principles of trust law which may in some future case, when possibly "the traditional indicators of a trust relationship" are absent, require a contrary holding and thus might disrupt interline railroad transportation. The principal problem before us is one of accounting for funds belonging to another, readily resolvable by recognized trust and pragmatic considerations to which we have alluded. These principles are appropriate to any industry, regardless of their operational problems, and our decision supports the congressional policy encouraging interline rail transportation of freight and passengers nationwide. We perceive no need to announce an entirely new and necessarily result-oriented rule of law which is not pertinent to our present decision, merely because of the fear that the traditional approach may be restrictive in some future unstated hypothetical situation.
 
 III. OTHER INTERLINE ACCOUNTS
 
 40
 The AAR accounting system and contractual obligations for the interline accounts other than those for freight and passenger carriage present different problems. In order to ascertain whether setoffs should be allowed as to Penn Central liabilities on these accounts, it is necessary to examine them seriatim.
 
 
 41
 Car Repairs. The Interlines frequently repair the equipment of other connecting carriers under the requirements of the National Safety Appliance Act, 45 U.S.C. Sec. 13. AAR rules direct the rendition of bills for repair work no later than the last day of the following month. A draft for payment may be drawn on or after the fifteenth of the second following month.
 
 
 42
 Overcharge and Loss and Damage Accounts. When a shipper finds too much has been charged by the railroads, or that he is due payments for loss of, or damage to, the goods shipped, he makes a claim to any carrier which participated in the shipment. That carrier investigates the shipper's claim, makes whatever payment is necessary, and then charges the responsible carrier. Accounts are stated on the 10th of each month for all shipper overcharge claims finally settled and all shipper loss and damage claims actually paid. The carrier which has paid the claim may then draw a draft on the responsible carrier on or after the 25th day of the same month.
 
 
 43
 Per Diem Accounts. When one railroad uses the cars of another railroad, it pays that carrier a daily rental. Reports of amounts owed are forwarded to the owing carrier by the 10th day of the second month following use of the car. The net balances of these accounts are subject to immediate draft.
 
 
 44
 Switching Accounts. When one railroad switches a car for the benefit of another railroad, a switching charge is made. Such charges for cars moving in interline shipments are computed by the destination carriers and then sent to the Interlines no later than the 18th day of the month after the charges were incurred. Settlement is on the 25th day of that month.
 
 
 45
 We have concluded that amounts due on these accounts are not held in trust. These accounts do not involve collection of money by one carrier for another. These accounts merely represent the performance of services by one railroad. Although no interest was paid to Penn Central, no accounts except for the per diem balances were subject to immediate draft as were the freight and passenger accounts. Therefore, as to these accounts, the Interlines at this juncture are in exactly the same position as other suppliers of Penn Central who were unpaid for goods and services delivered prior to the filing of the reorganization petition.
 
 
 46
 The Interlines argue that these amounts must be paid immediately because the accounts "arise directly from specific statutory requirements and are absolutely essential to the operation of a national rail transportation system." They argue that they are compelled (apparently by 49 U.S.C. Sec. 1(4)) to permit use of their box cars by Penn Central and other carriers. Similarly, the National Safety Appliance Act, 45 U.S.C. Sec. 13, requires that they repair Penn Central's cars if they break down on their tracks. They argue that a destination carrier is required by law to process claims for damage to goods in transit and to advance monies to discharge or settle the claim.
 
 
 47
 Despite the legal obligation to perform the services, there is no compulsion, statutory or otherwise, as to the manner by which the services shall be paid. Arrangements for payment or credit are voluntary.[11] Most important, however, is the recognition that no money is collected as to these accounts by Penn Central for other railroads.
 
 
 48
 The overcharge, loss, and damage accounts present a more difficult problem conceptually. Nevertheless, the essential basis for a trust does not exist. AAR practices call for one carrier to advance sums on behalf of other carriers when valid claims are made by shippers. Such advances are, in effect, a service one carrier renders for other carriers, similar to the services the Interlines perform for each other in renting and repairing cars. In a sense, if the Penn Central receives payment for a shipment, part of which eventually has to be repaid to the shipper, it could be argued that Penn Central in the interim holds the sums in trust to return to the paying carrier. However, at the time Penn Central originally received the freight payments, it had no notice that at a later date part of those sums would have to be returned. Any overcharge, loss, or damage claims at that time would be inchoate and amorphous. The relationship between the advancing carrier and the liable carrier is thus much closer to that of debtor-creditor than that of trustee-beneficiary.
 
 
 49
 Previously, we upheld the reorganization court's authority to prevent banks from using the self-help remedy of setting off amounts owed them by Penn Central against their obligations to Penn Central. In re Penn Central Transportation Company, 453 F.2d 520 (3d Cir. 1971) (the Bank Cases). Similarly, we have upheld its authority to enjoin shippers from setting off amounts Penn Central owed them for freight loss and damage claims against amounts they owed Penn Central for freight services. In re Penn Central Transportation Company, Nos. 72-1436 to 1438 (3d Cir. 1973) (the Shipper Cases).
 
 
 50
 In the Shipper Cases, we explained: (1) Under the Interstate Commerce Act, 49 U.S.C. Secs. 3(1) and 6(7), freight charges are accorded a preferred status and are not subject to the defense that the carrier owes the shipper money for other items. We noted that the only defense that can be raised to a carrier's suit for freight charges is "that the services have been paid for, that the services were not rendered, that the services were charged under an inapplicable tariff schedule, or that the rates were unreasonable." (2) Although a shipper nevertheless retains a right to assert a counterclaim in a carrier's suit for freight charges, Chicago & Northwestern Railway v. Lindell, 281 U.S. 14, 50 S.Ct. 200, 74 L.Ed. 670 (1930), that right is extinguished by the intervention of a railroad reorganization proceeding. (3) Since the shippers' claims did not have the legal status of defenses, they cannot defeat "the right of the railroad to collect absolutely all legal charges for freight services outstanding and unpaid."
 
 
 51
 In the Bank Cases, we reasoned that permitting creditors to refuse to pay their obligations because Penn Central owed them similar amounts would place them in a preferred position over other creditors and endanger the success of the reorganization. We noted: "Even secured creditors of a railroad must submit to the risk inherent in judicial suspension of the rights they normally would have to enforce their liens against property of the debtor during the pendency of a reorganization proceeding. New Haven Inclusion Cases, 1970, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 [1970]." 453 F.2d at 523.
 
 
 52
 In this case, we reaffirm the reorganization court's authority to preclude setoffs. The threat to the reorganization that we noted in the Bank Cases is present in the assertion of these setoffs. Penn Central's choses in action for the various interline charges are entitled to the same status as the freight charges in the Shipper Cases and the deposits in the Bank Cases. The district court concluded that to permit setoffs could discriminate against many other suppliers of services and equipment and would be unfair because of the unresolved issue of the relative priorities of the claims. It also concluded that Penn Central's cash position would be unduly injured by allowing the setoffs.
 
 
 53
 In the absence of a trust relationship, whether to permit a setoff is in the discretion of the district court. See Susquehanna Chemical Corp. v. Producers Bank & Trust Co., 174 F.2d 783, 786-787 (3d Cir. 1949). We find no abuse of discretion in the circumstances of this case.
 
 
 54
 For the foregoing reasons, the interline railroads may not set off their claims, except for freight and passenger accounts, against amounts owed by them to Penn Central. The freight and passenger claims are entitled to different treatment because of their trust character and the Interlines' resulting right, to payment regardless of the reorganization.
 
 IV. THE EFFECT OF ORDER NO. 9
 
 55
 Order No. 9 requires Penn Central to pay all interline accounts "first stated or presented for settlement on or after [July 1, 1970]." Appellants argue that Penn Central's failure to pay for May 1970 car repairs, which became payable on or after July 1, violates the order.[12] The district court rejecting appellants' argument reasoned:
 
 
 56
 This interpretation equates presentation of a draft and statement of the account; more importantly, it overlooks the word "first" in the Order. Accounts which were either stated or presented prior to the date of Order No. 9 were not required by that Order to be paid, and thus respondent's contentions with respect to the Car Repair and Passenger accounts are clearly without merit.
 
 
 57
 We agree with the district court.
 
 
 58
 Appellants argue that the parties drafted the language of the order and that the testimony at the hearing prior to its issuance demonstrates that they intended it to require payment of all sums that became payable in July 1970, not just those stated for the first time in July. They note that Penn Central's Comptroller, Charles Hill, in explaining Penn Central's intention to pay "interline accounts to be presented after or scheduled to be presented after June 30," presented to the court an exhibit showing the amounts Penn Central planned to pay in July. Specifically included were drafts in the amount of $1 million for car repairs, which became subject to draft on July 15 under the AAR rules. Moreover, they note, Mr. Hill stated:
 
 
 59
 The initial indication of actual disbursements begins with July 23 on revenue accounts, on July 13 on mileage accounts, and intermediate dates on car repairs.
 
 
 60
 The accounts that became subject to draft on July 15 would, under the AAR rules, represent May car repairs. Appellants also note that their counsel stated to the district court that if the order they proposed to the court in their motion of June 24, 1970, i.e., that Penn Central be required to pay all interline balances, were not granted that they would be satisfied with an order which "embraces those accounts and balances which Penn Central contemplates paying in July."
 
 
 61
 From this course of events, we conclude that the Interlines undoubtedly favored payment of interline accounts in full and that they proposed as a less drastic remedy that Penn Central be bound by its projections for July. Unfortunately, the step we cannot take is to conclude that the district court accepted either of these positions. The district court, in inviting counsel to submit an order to it, stated that it was adopting the projections:
 
 
 62
 The order which is being entered is not to be taken as either approval or disapproval of the projections set forth in these documents or of any of the projected expenditures.
 
 
 63
 The district court explained that it desired an order separating pre-petition interline charges from post-petition interline charges. It concluded that "charges stated from and after today would represent the post-petition interline balances" and specifically asked counsel to prepare an order providing for their payment.[13]
 
 
 64
 We think the court's oral statement pertaining to its order indicates that Order No. 9 did not contemplate the payment of all accounts that would become due for payment in July. The phrase "charges stated" is most reasonably interpreted as meaning charges first reported in the month of July. It strains the language unduly to interpret it to mean charges which have been previously reported but for which payment becomes due in July. The stark language in the actual order, i. e., "stated or presented," could arguably be interpreted to encompass charges for which the drafts are presented in July, but we think the district court's statement to the parties as to the nature of the order he desired to enter precludes this interpretation.
 
 
 65
 We also believe that the district court's interpretation of its own order in the decision appealed from is entitled to great weight. We find no compelling basis to hold otherwise. We have already found that the parties' objections to the district court's entry of this order are without merit. They can petition the district court again if they believe that it should exercise its discretion to modify the order. We also note that the court in entering Order No. 9 provided explicitly that it would not prejudice the rights of the Interlines to claim a priority at a later time.
 
 
 66
 The order of the district court will be affirmed except as it operates to preclude the interline carriers from offsetting amounts they owe Penn Central against amounts Penn Central owes them for freight and passenger services. The Interlines shall be entitled to offset any amounts Penn Central owes them for freight and passenger services as of the date of this opinion, and Penn Central will be obligated to pay any remaining balances due for these accounts. The case will be remanded to the district court for further proceedings consistent with this opinion.
 
 ADAMS, Circuit Judge (concurring):
 
 67
 Though I concur in the result reached in this case, I am troubled by the heavy reliance by the majority upon the timeworn tenets of trust law in dealing with the issues presented here. Inasmuch as this appeal involves the functioning of the national transportation network, closer attention to pragmatic factors and to Congressional pronouncements would appear to be warranted.
 
 
 68
 Congress has long been concerned with the establishment and maintenance of a viable national rail system. In part, this concern is manifested in legislation tailored to encourage and facilitate "interline" rail transportation of freight and passengers.[1] To resort, as the majority does, primarily to "traditional common law trust principles" to resolve this case is to overlook the legislative policy embedded in these pertinent statutes. Moreover, the majority's stance fails to address the practical problems confronting the railroad industry today. In this time of proliferating difficulty for the railroads, such an approach does little to advance the enterprise of "developing, coordinating, and preserving a national transportation system."[2]
 
 
 69
 Section 1(4) of the Interstate Commerce Act[3] makes it the duty of each regulated rail carrier to participate in the interstate transportation of freight and passengers. In addition, it requires that the carriers "establish reasonable through routes with other such carriers, and just and reasonable rates, fares [and] charges . . . applicable thereto."[4] Carriers participating in through routes are directed to "provide reasonable facilities for operating such routes and . . . to make reasonable rules and regulations with respect to their operation . . . " If connecting carriers fail to create voluntary through routes, section 15(3) of the Act[5] empowers the Interstate Commerce Commission, under certain conditions, to order their establishment.[6]
 
 
 70
 The policy underlying this statutory arrangement is not difficult to discern. "Interline," long-distance rail carriage over a through route obviates much of the need for duplicative, parallel rail lines. Additionally, through-route service precludes the inconvenience that would result if a shipper had to make separate arrangements with each interconnecting carrier for a long-distance haul. A vigorous and efficient interline rail network thus assures that, as the court below stated, "[t]he nation's railroads function in many ways as a single system." The sections of the Interstate Commerce Act discussed above seek to foster and preserve this unitary rail scheme.
 
 
 71
 There is no statutory compulsion for interconnecting rail carriers to utilize any particular method of collecting fares and freight charges for a through-routed shipment. But, as a practical matter, only one such method is feasible. That is for a single carrier-either the originating or the destination carrier-to collect the entire fare, and then remit to the interline carriers their pro rata portions. This arrangement is apparently subscribed to by the entire industry, and is incorporated in the rules of the Association of American Railroads. A departure from this procedure-for example, insistence by each interline carrier upon immediate payment by the shipper-might well undermine the entire system of interline rail transportation. At a minimum, it would greatly impede the smooth and efficient functioning of the through-route network.
 
 
 72
 At least one other court has concluded that, since practical considerations militate so strongly in favor of collection by a single carrier, that carrier should be deemed a "trustee" for the interline railroads.[7] Such a conclusion, when transposed to the scenario of a railroad reorganization case, requires that the interline carriers be granted a superior status vis-a-vis the trustee-railroad's other creditors. Conveniently, there are present in this case enough of the common indicia of a fiduciary relationship to support the majority's conclusion that here, too, the Penn Central holds the interlines' freight and passenger revenues in "trust." Consequently, and I believe correctly, the majority grants the interlines the preferred position that "beneficiary" status merits under the relevant reorganization principles.
 
 
 73
 What the majority does not appear to consider, and what I suggest may be of critical importance, is the possibility that, in another case, the absence of any of the traditional indicators of a trust relationship would, under their view, require a contrary holding.[8] Exclusive reliance upon the precepts and terminology of trust law would seem, in such a case, to dictate that a court deny the interlines any priority over other creditors. Stripped of that priority, the interlines might well insist upon immediate payment from shippers for each segment of a long-distance haul. Such insistence, with the attendant dislocation of the through-route system, would be especially likely where, as here, the originating or destination carrier was on the verge of going into reorganization.
 
 
 74
 The disruption of interline transportation that might result from application of the majority's ratio decidendi to another case would seriously thwart the policy expressed in the Interstate Commerce Act. Moreover, it would tend to impede promotion of an "adequate, economical, and efficient" transportation system, thus hampering effectuation of our National Transportation Policy.[9] The majority does not grapple with these considerations. Its approach, while leading to a salutary result in the case sub judice, overlooks these broader ramifications by focusing too narrowly upon the situation at hand.
 
 
 75
 Rather than merely invoke the hoary principles of trust law to settle this case, I would treat the problem of interline freight and passenger accounts as a sui generis matter. Having perceived Congress' interest in creating and maintaining a viable interline rail system, it would be appropriate to hold that, even in the absence of anything formally resembling a "trust," the interlines are entitled to a preferred position with respect to freight and passenger revenues owed them by a railroad in reorganization.
 
 
 76
 This is not to suggest that venerated legal doctrines can never provide guidance to a court confronted with novel questions of transportation law. But where Congress has, by statute and articulation of a national policy, prompted the judiciary to consider the effects of its decisions upon the nation's entire transportation system, there does not seem to be justification for exclusive reliance upon the narrow principles of private law.[10] The demands in treating a matter of national transportation policy are best met by a candid and informed weighing of competing interests, within the compass of the judicial process, rather than by use of dogmas or labels that may prove too inflexible to solve the non-Euclidean problems that are presented.
 
 
 77
 The majority also concludes that, unlike freight and passenger revenues, other interline monies-those relating to car repairs, overcharges, freight loss and damage, per diem car rentals, and switching charges-are not held in "trust." Since this holding would not appear to work any substantial disruption of the interline rail schema, I concur in this aspect of the result as well.
 
 
 78
 WEIS, Circuit Judge, joins in this concurring opinion.
 
 
 
 [1]
 An "interline railroad" is a railroad common carrier which cooperates with other railroads in the transportation of passengers or property over their lines, as required of all railroads engaging in interstate commerce by the Interstate Commerce Act, 49 U.S.C. Sec. 1(4). The act provides in relevant part:
 It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto; . . . .
 See, e. g., Southern Ry. Co. v. Flournoy, 301 F.2d 847, 854 (4th Cir. 1962).
 
 
 [1]
 This system of accounts is established and governed by rules promulgated by the Association of American Railroads ("AAR"), of which the railroads in this proceeding are members
 
 
 [2]
 The order stated that Penn Central was authorized to pay
 all interline accounts and balances owing by Debtor, including amounts in respect of revenues from freight, passenger or other traffic interchanged with other carriers, and charges for repairs of, or loss damage to, rolling stock and equipment interchanged with other carriers, all claims for injuries, death or other loss or damage to passengers and others arising from the operation of its railroad and properties, and all claims for loss, damage or delay to freight and baggage and all claims for overcharges and for reparation, and all accounts for services, materials and supplies rendered or furnished to the Debtor, whether chargeable in the first instance to expenses, or otherwise.
 
 
 [3]
 The "interline carriers" involved in this appeal are the 39 railroad systems set forth in the caption of this opinion. All appellants except the Indiana Harbor Belt Railway Company and the Louisville and Nashville Railroad Company intervened in the proceeding below as the Committee of Interline Railroads. The Committee includes 40 additional railroads not here involved
 
 
 [4]
 The relevant portion of Order No. 9 states:
 And Now, to wit: this First day of July, 1970, it is Hereby Ordered that paragraph 3 of the Order of June 21, 1970, is hereby Amended so as to direct and require the Debtor (in lieu of authorizing the Debtor in its discretion) to pay to other railroads freight charges and divisions, passenger or ticket charges and divisions, per diem, mileage, and per diem claims, car repairs, trailer rentals and all other interline accounts and balances first stated or presented and due to be stated or presented for settlement on or after the date of this Order in accordance with the now existing rules and procedures of the Association of American Railroads and otherwise in accordance with the rail carriers' ordinary business practice. [Emphasis supplied.]
 
 
 [5]
 The parties have indicated that these amounts are primarily May 1970 freight and passenger balances
 
 
 [6]
 If the settling carrier is unable to forward the interline freight summary in time to reach the other carriers by the twentieth of the month, upon request it must notify the carriers by prepaid telegram. Thus, freight balances are subject to draft, at the latest, on the twentieth
 
 
 [7]
 The affidavit of Assistant Vice President Wigstrom of Burlington Northern, Inc., asserted:
 [A]t more than 1300 stations must transmit to the Company's general offices (through three regional customer accounting centers) the waybill for each shipment terminated at their respective stations. The waybill data for every terminated interline shipment must, as noted by Mr. Bergey, be abstracted in order to prepare the interline settlement statement. The settlement of interline accounts cannot be achieved either practically or economically among the nation's railroads on anything approaching a daily basis.
 
 
 [8]
 The 18-day period, in addition to facilitating accounting, preserves the fairness of the nonsegregation because most of the charges have been collected by the time of the drafting date
 
 
 [9]
 The Interlines rely on Morgenthau v. Sugar Land Railway Company, 83 F.2d 72, 74 (5th Cir. 1936); Baltimore & Ohio R.R. Co. v. Thompson, 80 F.Supp. 570, 586 (E.D.Mo. 1948), aff'd 180 F.2d 416 (8th Cir. 1950); and Atlantic Coast Line Railroad v. Pennsylvania Railroad Company, 12 F.Supp. 720 (E.D.Pa.1935), to support their contention that the passenger and freight account monies were held in trust. Although there is dicta in each of those cases indicating that such funds collected by an interline carrier are held in trust, we do not rely extensively on that dicta, because the issue of whether or not a trust existed was not squarely presented to the court in any of the cases
 
 
 [10]
 The settlement procedure in Southern was similar to that in this case. The court described it as follows:
 The two carriers had a junction settlement arrangement under which freight interchanged was re-billed at Cornelia. On traffic moving inbound to the Tallulah Falls, Southern paid all prior participating carriers their divisions or proportions of the revenue for traffic handled over their lines. For these advances as well as for its own division or proportions of the inbound freight charges, Southern looked to the Receiver for reimbursement and payment. As to such inbound shipments, the Receiver would, and did, collect the freights from consignees. On movements out-bound from the Tallulah Falls, the destination carrier collected the freight charges and paid over to Southern the share due it as well as the Tallulah Falls. The settlement arrangement called for adjustment four times a month. On striking the balance, payment was to be made by, or to, the Receiver or Southern as the case might be.
 306 F.2d at 123.
 
 
 [11]
 The district court properly reasoned:
 While it is true that the interline railroads are required, for example, to accept from each other and to transport freight and passenger traffic and to correct unsafe conditions found on each other's cars, there is no requirement that interline railroads extend credit to each other. In fact, in proceedings leading to the entry of Order No. 9, the interline railroads detailed measures that could be taken to put a railroad, that could not be counted on to make its interline balance settlements, on a "cash" basis. E. g., Tr. 23-26; Memorandum of Burlington Northern, Inc. (Document No. 18) at 5. Moreover, it is apparent that the interline railroads' description of such measures did not exhaust the list of measures that could be used to put a railroad on a cash payment rather than a credit basis. See Southern Ry. Co. v. Flournoy, 301 F.2d 847, 855-856 (4th Cir. 1962) (security deposit; creditor railroads' control of car movements).
 
 
 [12]
 Appellants also make this argument as to passenger accounts, but since we have concluded that the passenger receipts are held in trust, we need not specifically discuss their status under Order No. 9. In the district court, appellants also asserted that unpaid miscellaneous bills were required to be paid by Order No. 9, but they do not press this contention on appeal
 
 
 [13]
 The court stated:
 From the evidence presented, it seems quite apparent that the post-petition interline charges, that is to say the charges stated from and after today would represent the post-petition inter-line balances, can be paid without unduly jeopardizing any of the other essential payments that the railroad must make.
 I therefore will enter an order and will invite counsel to submit the written order for entry which will make mandatory the payment of post-petition inter-line balances until further order of this Court.
 
 
 [1]
 See, e. g., sections 1(4), 15(3), 15(4) and 15(6) of the Interstate Commerce Act, 49 U.S.C. Secs. 1(4), 15(3), 15(4) and 15(6)
 
 
 [2]
 The National Transportation Policy, 54 Stat. 899, 49 U.S.C. preceding Sec. 1
 
 
 [3]
 49 U.S.C. Sec. 1(4)
 
 
 [4]
 A "through route" is an arrangement between interconnecting railroads for the continuous carriage of goods or passengers from the originating point on the line of one carrier to a destination on the line of another. See St. Louis Southwestern Ry. Co. v. United States, 245 U.S. 136, 139, 38 S.Ct. 49, 62 L.Ed. 199 (1917)
 
 
 [5]
 49 U.S.C. Sec. 15(3)
 
 
 [6]
 See generally Thompson v. United States, 343 U.S. 549, 72 S.Ct. 978, 96 L.Ed. 1134 (1952). Section 15(4) of the Act, 49 U.S.C. Sec. 15(4), limits the power of the Commission to order a through route where to do so would force a railroad to "short haul" itself
 
 
 [7]
 Atlantic Coast Line R. Co. v. Pennsylvania R. Co., 12 F.Supp. 720, 722-723 (E.D.Pa.1935). In a related case, the same court described a typical interline shipment:
 "[t]he service performed was a haul of citrous fruits from Florida to delivery points in the Northern States. A number of railroads, which we shall call five, participated in order in the carriage, making of it one continuous haul . . . . The last link at the delivery end was the Pennsylvania Railroad. Because of a convenience so great as to be imperative, the Pennsylvania Company collected for the whole haul." Atlantic Coast Line R. Co. v. Pennsylvania R. Co., 12 F.Supp. at 726 (E.D.Pa.1935).
 
 
 [8]
 Considering the turbulent, changing situation in the railroad industry, this does not seem a remote possibility
 
 
 [9]
 See Note 2, supra, and accompanying text
 
 
 [10]
 Cf. New Haven Inclusion Cases, 399 U.S. 392, 431, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970)