NYGAARD, Circuit Judge,
concurring and dissenting.
I concur in the court’s opinion, except Part 11(B), where, the court concludes that the FERC-ordered refunds are held in trust, and Part V, where it applies the lowest intermediate balance test to limit the amount of those refunds Columbia may pass through to its customers. Because I believe that we should not apply traditional trust law in an area that is clearly unsuited for its application, I write separately.
Central to the court’s analysis is In re Penn Central Transportation Co., 486 F.2d 519 (3d Cir.1973) (in banc). There we confronted the issue of whether, under an industry-wide accounting system, railway carriers had any equitable interest in money collected for each other. Although we noted that a “common sense interpretation of this system would indicate that funds collected by one railroad for and in behalf of another railroad are held in trust by the collecting railroad,” id. at 524, we went on to apply the analytic framework of traditional state trust law. A trust is defined as a fiduciary relationship with respect to property, subjecting the person with legal title to equitable duties to deal with the property for the benefit of another person, “which arises as a result of a manifestation of an intention to create it.” Restatement (Second) of Trusts § 2 (1959) (emphasis added). The parties’ manifestation of intention is the ultimate touchstone of wheth *1065 er or not a trust exists. Penn Central, 486 F.2d at 624.
Since the individual railway carriers had not signed trust agreements with each other, manifesting “an intention” to create trusts, the Penn Central court had to consider other indicia of a trust relationship. We held that, “Especially important in the present case are (1) the absence of any payment of interest on monies collected during the time they are held by the collecting railroad, and (2) the commingling of the monies with general funds by the collecting railroad.” Id. Although the railways commingled collected money with their own accounts, and while generally commingling indicates a debtor-creditor relationship and not a trust, we concluded that commingling was not necessarily conclusive and that it had minimal significance in the extraordinary operation of interline railroads. Id. at 624-26. We found the absence of any provision for the payment of interest by the collecting carriers more significant. We noted, “A debtor-creditor relationship entails the right to use another’s money, the usual quid pro quo for which is the obligation to pay interest.” Id. at 524.
The concurrence in Penn Central opined that application of the traditional law of trusts to a complex industry governed by pervasive federal regulations may not always be suitable because there exists “the possibility that, in another case, the absence of any of the traditional indicators of a trust relationship” may dictate a conclusion contrary to the congressional intent behind the creation of a pervasive system of federal regulations. Id. at 532-33 (Adams, J., joined by Weis, J.) (emphasis in original). This appeal is such a case.
None of the traditional indicia of a trust relationship identified by the Penn Central court is present here. As expected, there are no separate, express trust agreements. And like the railway’s accounting system, Columbia employed a combined cash management system which commingled funds. This was necessitated by the impracticalities of maintaining different accounts for every business purpose. Applying Penn Central’s reasoning that commingling of funds “is only one indicium and ... not necessarily conclusive,” id., this court concludes that commingling does not preclude a finding of a trust. As for the payment of interest or lack thereof, the dispositive factor in Penn Central, the majority tells us that the payment of interest here is also not important because it does not manifest an intention to create a debtor-creditor relationship instead of a fiduciary relationship because here a statutory provision mandates the interest payments.
I agree with the majority to the extent that commingling of funds and payment of interest do not preclude a conclusion that Columbia has no equitable interests in these FERC-mandated refunds under 11 U.S.C. § 541(d). I disagree, however, with the application of trust law when it is clearly unsuited to this issue. When nothing indicates one way or the other whether the parties intended to create a trust, and moreover, Columbia, by seeking to distribute these refunds to the customers was simply trying to obey the law, there is no good reason to apply the law of trusts, which after all is predicated upon the intentions of the parties to create a fiduciary duty. Instead, we should balance the competing policies and try to discern the congressional intent behind the Bankruptcy Code, 11 U.S.C. § 541(d), and the Natural Gas Act (NGA), 15 U.S.C. § 717 et seq. See Penn Central, 486 F.2d at 533 (concurrence).
Section 541(d) nowhere refers to “trusts”; it provides that if a debtor does not have “any equitable interest” in the property, that property does not become a part of the debt- or’s estate. A finding of an equitable interest in the FERC-mandated refunds would contravene not only the policies of the NGA, but also the Bankruptcy Code. Under the NGA, all rates and charges must be “just and reasonable,” 15 U.S.C. § 717c(a), and Congress empowered FERC to ensure this. If a natural gas company overcharges its customers, FERC may order refunds. Id. § 717c(e). After all, these refunds belong to the customers. A natural gas company must pass the refunds to its customers upon pain of civil and criminal penalties. See id. § 717s(b), 717t. Thus, even without the benefit of the law of trusts, it is clear these refunds arise from a federal statute; they were ordered by a federal agency empow *1066 ered by Congress; they must be passed through to the customers lest the holder violate the law; therefore, they belong solely to the customers under federal law.
It is undisputed that under the ordinary workings of the NGA Columbia would have no equitable claim to FERC-ordered refunds. See Texas E. Transmission Corp., 39 F.P.C. 630, 642, aff'd, 414 F.2d 344 (5th Cir.1969); In re Area Rate Proceeding, 53 F.P.C. 821, 822 (1975). The creditors, however, appear to argue that Columbia has some equitable interest in the refunds under the Bankruptcy Code; that is, the Code somehow intervenes in the normal regulatory workings of the NGA. But to say that the Code alters the equitable interests of the parties in the refunds is to say that it creates or alters property rights. This then contravenes the policy of the Code, which creates a set of procedures by which a debtor’s property is divided, but which does not create substantive property rights. See In re Nejberger, 934 F.2d 1300, 1302 (3d Cir.1991); L. King, 4 Collier on Bankruptcy, ¶ 541.02[1] (Lawrence P. King, E.D., 15th ed. 1993). Neither the NGA nor the Code mandates that Columbia has “any equitable interest” in the FERC-ordered refunds, and since they are not a part of the debtor’s estate, the creditors have no interest in them.
If the issue is simply whether Columbia has an equitable interest under section 541(d) in the refunds, then so long as we agree that it does not have such an interest, how the court gets to this conclusion may appear academic. It is not. By applying the law of trusts, the majority has bootstrapped itself into applying the “lowest intermediate balance” test. That test is premised on the principle that whenever trust funds are commingled and cannot be traced, and all the money is later withdrawn, the trust fund is treated as lost even though funds are later deposited into the account. Connecticut Gen. Life Ins. v. Universal Ins. Co., 838 F.2d 612, 619 (1st Cir.1998). So, in cases where the account is reduced to a sum less than the trust fund, the test requires that the trust be considered dissipated except as to the remaining balance. Id. See 4 Collier on Bankruptcy ¶ 541.13, at 541-79-80.
Columbia’s normal business practice was to minimize its cash balance, and so excess money was either used to pay debts or invested. At the time the bankruptcy petition was filed, Columbia had only $3.3 million in its account, even though it had received from upstream suppliers $21 and $1.8 million in prepetition refunds for the downstream customers and the GRI. Since the $3.3 million represents the lowest intermediate balance, the application of trust law to this case will result in a $19.5 million loss to the customers and GRI.
The application of the lowest intermediate balance test is both harsh and arbitrary considering the circumstances, and quite simply wrong. No one disputes that commingling of funds is necessitated by the administrative impracticality of keeping separate accounts for every business purpose. Although the majority recognizes that commingling has “little significance” in determining the existence of a trust because of business necessity, it apparently has great significance in determining the amount Columbia must refund. If business reality dictates that funds be commingled and that cash flow be fluid, which is the case with complex industries, it is arbitrary to freeze the account at the time the bankruptcy petition is filed and say that whatever money withdrawn at that time has been “dissipated.” Since the filing of the petition, Columbia’s cash flow has exceeded the amount of its obligations to the customers and GRI. Columbia has enough money to pass through all the refunds it received or will receive.[1] The application of the lowest intermediate balance test therefore contravenes the congressional intent behind the Natural Gas Act; under the NGA, these *1067 refunds — all of them — belong to the customers, and if Columbia has the ability to pay, trust laws notwithstanding, it should be allowed to pay in full. Thus, other than to adhere rigidly to the principles of trust law, which I do not think apply to this case, there is no good reason to limit the amount of the prepetition refunds to the lowest intermediate balance. I therefore respectfully dissent from Parts 11(B) and V of the majority opinion.

. Even if we apply the law of trusts, I note that dissipated funds may be replenished, which is what Columbia did. See Restatement (2nd) of Trusts § 202, comment m (1959) ("Where the trustee deposits trust funds in his individual account in a bank, and makes withdrawals from the deposit and dissipates the money so withdrawn, and subsequently makes additional deposits to his individual funds in the account, manifesting an intention to make restitution of the trust funds withdrawn, the beneficiary’s lien upon the deposit is not limited to the lowest intermediate balance."). See also In re New York, S. & W. R.R. Co., 17 B.R. 905 (D.N.J.1981).