## In re CHICAGO & N. W. RY. CO.

## CHICAGO & N. W. RY. CO. v. RECONSTRUCTION FINANCE CORPORATION et al.

### Nos. 7656, 7657.

Circuit Court of Appeals, Seventh Circuit.

June 6, 1941.

Rehearing Denied June 30, 1941.

Luther M. Walter and Helen W. Munsert, both of Chicago, Ill., for appellant.

Lee Walker, of Chicago, Ill., Cassius M. Clay, Russell L. Snodgrass, and A. Marvin Braverman, all of Washington, D. C., Wm. D. Kerr, Kenneth F. Burgess, Douglas F. Smith, and Geo. Ragland, Jr., all of Chicago, Ill., Fred N. Oliver, Edwin S. S. Sunderland, and Thos. O'G. FitzGibbon, all of New York City, Henry F. Tenney, Roger R. Leech, Chas. M. Thomson, Cyrus H. Adams, and James P. Dillie, all of Chicago, Ill., Orrin G. Judd and Edward K. Hanlon, both of New York City, and Ferris E. Hurd, of Chicago, Ill., for appellees.

Frank C. Nicodemus, Jr., of New York City, for intervenor.

Before EVANS and KERNER, Circuit Judges, and SULLIVAN, District Judge.

EVANS, Circuit Judge.

Appellant sought reorganization under Section 77 of the Bankruptcy Act, 11 U. S.C.A. § 205. In due course a plan of reorganization was approved by the Interstate Commerce Commission and then by the District Court. By this plan preferred and common stockholders of the debtor are eliminated, and given no interest in the new company. Appellant, in order to modify that part of the plan of reorganization, which excluded all stockholders, and to challenge the order refusing to refer the plan back to the I. C. C. to determine and certify values, applied to the Interstate Commerce Commission for a money allowance to carry its appeals to this court. Its petition was denied "without prejudice to renew it at such time as debtor is prepared to show actual expenses incurred and actual benefit to the estate."

The District Court was then asked for an order directing the I. C. C. to make such a maximum allowance for said expenses and, in case of the court's refusal to so direct the I. C. C., it, the District Court, was requested to fix the amount and order the trustee to pay the expenses of such litigation.

The District Court refused both petitions and entered two orders. One denied appellant's motion to direct the I. C. C. to make and determine the maximum allowance for expenses of printing the record on appeal, etc. The second order denied appellant's motion for allowance by the District Court of an expense authorization to cover the printing of said record.

The District Court based its denial on the ground that it "had no supervisory power over the I. C. C." and it lacked power to grant the relief refused in the second order.

It is estimated that $17,477 will cover printing and other expenses on said appeal. These estimates are substantiated by letters from the clerks of the District Court and this court, and cover all costs, including appeal to the Supreme Court, excepting only the cost of printing briefs, bond premiums, and attorneys' fees. Through stipulations, substantial parts of the record will be omitted from the printed transcript, thus shortening the same and lessening the costs of printing to an estimated $12,750.

It is from these two orders denying allowances to cover said expenses that these two appeals are taken.

The prayer of the debtor is joined in by committees representing the common and preferred stockholders. It is opposed by the I. C. C., the R. F. C., the Life Insurance Group Committee, and the Mutual Savings

Bank Group Committee.[1] The counsel of the Chicago, Milwaukee, St. Paul R. Co., has, with the court's permission, filed a brief amicus curiae. It supports debtor's petition.

Grounds for sustaining the order of the District Court are:

(1) The expenses are not yet "incurred" as required by Sec. 77, sub. c(12).

(2) Appellate proceedings are not expenses "incurred in connection with the proceedings and plan" as required by said section.

(3) Allowances may be made only to the extent to which the estate of debtor is benefited, and here no such benefit has been, or can be, shown.

(4) The debtor has no interest in appealing from the plan of reorganization, but the real parties in interest are the common and preferred stockholders whose stock is wiped out by the plan under attack. Since it is they who are interested in having the plan set aside on appeal, it is they who should pay the expenses of such appeal.

(5) Congress gave to the I. C. C. jurisdiction of railroad debtor reorganizations reserving to the District Court, as a court of bankruptcy, certain original and supervisory power over the debtor and the I.C.C. Sec. 77, dealing with this phase of bankruptcy, did not give the District Court power to compel the I. C. C. to make allowances to litigants who are aggrieved by the plan of reorganization or take money belonging to debtor's estate and pay expenses of appeal from orders by it made. Nor has the Court authority to direct a trustee to pay expenses upon appeal from an order by it made, fixing status of holders of securities of said debtor.

(6) The relief here sought is in effect mandamus which does not lie in this sort of case.

The I. C. C. decision was not unanimous. Four of its eleven members dissented. The majority, on reconsideration, expressed themselves thus:

"In fixing a maximum we, however, must decide how much is reasonable. To do that, it is essential to estimate the value of service or to determine the necessity of expense to the estate. If it were required that as part of the process of reorganization appellate decisions be procured as to all decisions and all appealable orders issued under section 77, then it would be appropriate that the estate be fully responsible in all instances for the cost of appealing such decisions or orders. If that were the case it might well be proper to provide for payment in advance of the determination of the outcome of the appeal. But there is no such provision in section 77. Furthermore, acceptance of the theory that appeals are free of cost to the appellant and may even be paid for in part in advance will not be likely to decrease litigation, nor to expedite the reorganization of bankrupt railroads. A party in interest may appeal any appealable question arising in the course of the proceeding, but whether the expense of such an appeal is a proper charge against the estate and the extent to which the expense should be borne by the estate can only be determined when we are able to determine the value of the litigation to the estate. Such an appeal may, of course, be worth to the estate all it costs, or it may be merely a nuisance. It is unlikely that Congress intended that an estate must necessarily underwrite the expenses of disappointed parties to any extent. It is entirely clear that for us to do so in advance by fixing a maximum before the expense is incurred is contrary both to the spirit and to the letter of section 77."

In one dissenting opinion we find this statement:

" * * * in passing upon this question of whether an expense is a proper charge against the estate we ought to bear in mind that the judge can overrule us, if we an-

---

[1] A search of this court's records shows several others have appealed from the order confirming the plan, namely:

No. 7563—Susman, Asher, Forrest and Forrest (owners of debtor's adjustment mortgage bonds.)

No. 7564—Galt, Byrd, Leyman, Schuster, Overman & Metcalfe, protective committee for holders of common stock.

No. 7565—Harrison, Broder, Dornstreich & Hauck, protective committee for holders of preferred stock.

No. 7566—City Bank Farmers Trust Co., trustee under first and refunding mortgage of 1920.

No. 7567—Bank of New York, as trustee under first mortgage of 1912.

No. 7568—Irving Trust Co., as successor trustee under mortgage of Milwaukee and State Line Ry. Co.

swer in the affirmative, but not if we answer in the negative. In such circumstances we should, I believe, resolve reasonable doubts in favor of an affirmative answer, * * *.

"Such procedure on our part is peculiarly appropriate when the expenses in question are, as here, in connection with a proposed appeal * * * for the purpose of determining whether or not the plan of reorganization which we have formulated and which the judge has approved is in accord with law. In this case our plan of reorganization excludes the stockholders of the old company on the ground that their equity in the property has no value. I believe our finding to this effect was justified. Nevertheless it is a serious thing to these stockholders, of whom there are thousands holding small lots which were bought strictly for investment purposes * * *. Moreover, the finding by its very nature makes it harder for these small holders to bear the expense of an appeal. * * *

"I realize that the denial of the petition before us is without prejudice to its renewal 'at such time * *' but a denial of such petition at this stage might easily prevent this later stage from ever being reached."

Another dissenter expressed himself thus—

"In such cases as this, where we have held that in the reorganization of the property, stock once having a value of hundreds of millions of dollars is to be totally disregarded, we should not indulge in superfine, specious, legal refinements to prevent or place obstacles in the way of a review of our conduct by the higher courts * * *.

"Since a major portion of the debtor's appeal expenses is payable before the appeals can be docketed, the petition is not premature so far as our function of fixing a maximum limit is concerned, although the question of benefit to be derived by the estate may be important in determining judicially whether any part of the expenses should be borne by the estate."

The trial court said:

" * * * I think it is desirable from the standpoint of the debtor, and from the standpoint of everybody interested in this estate and from the standpoint of society, that the judgment which has been rendered here be demonstrated to be fair and equitable, if it is; and, if it is not, it ought to be overturned. And I think that there is something that may very properly be financed by the estate. That is my view."

We also quote from the District Court's memorandum:

"The debtor and its preferred and common stockholders contended before the Commission and the court that the plan cuts off $250,000,000 in values, and in support of their contention they referred to valuations made in years past by the Commission. The plan does cut off all interest of the Debtor and therefore of the preferred and common stockholders in the property. This is an exceedingly serious matter to thousands of people, many of whom have invested their life savings in the stocks of the Debtor. * * *

"The Debtor now moves the court to order the Debtor's trustee to pay out of the trust funds the necessary money for the costs of the appeals notwithstanding the action of the Commission declining to fix the maximum limit therefor. The court is only permitted to make allowances to be paid out of the debtor's estate for expenses 'within such maximum limits as are fixed by the Commission.' The Commission having refused to fix maximum limits, the court is without power to order the Debtor's trustee to pay out of the trust funds money for the costs of appeals."

" * * Had the Commission fixed a maximum permitting, the court would have allowed the request. The Commission has heretofore fixed the maximum of allowance to attorneys for both preferred and common stockholders for services rendered by them before the Commission and before this court, though the preferred and common stocks were found to be without value. The allowances now sought seem to be of a like nature."

Determinative of this appeal is the construction of Section 77, 11 U.S.C.A. § 205, and more specifically the ascertainment of the relative duties and power of the United States District Court and the Interstate Commerce Commission, in matters relating to the operation of the debtor's railroad during bankruptcy, plans for its reorganization, service charges and expenses incurred therein and to be incurred, and more particularly by stockholders who have been eliminated in the plan of reorganization.

Two positions are taken in respect to the powers granted by this section to the District Court. One asserts the duty of the District Court is somewhat clerical—

entering orders approved by the I. C. C. The other view recognizes the court as possessing exclusive jurisdiction of the estate of the debtor and of its administration and with power to bring about and give validity to a plan of reorganization which looks to, and prepares for, the future usefulness of the debtor. Its jurisdiction is plenary and exclusive, save as Congress has conferred on the I. C. C. certain duties consistent with its experience and familiarity with railroad operation.

■ As the debtor was distressed financially (otherwise it would not be in court) it was either unable to meet its debts as they became due, or to pay debts actually due; hence these proceedings were instituted. It was both natural and logical that jurisdiction of certain phases of such judicial activities, such as relate to financial set-up, meeting of obligations, determination of value, etc., should be given to the I. C. C. For this work the legislation wisely designated the body whose long and favorable record justified the confidence of Congress and made for an ideal complement of activities by the courts and the Government administrative body, to-wit, the U. S. District Courts and the I. C. C. But neither the scheme of the legislation nor the words of the statute justify the conclusion that the court was to delegate its judicial powers to the I. C. C. and merely sign the orders which the I. C. C. advised, or approve other orders which the I. C. C. made. Each, we think, was given express powers; each, a jurisdiction of its own. Perhaps the word "function" or "duty" would better describe the I. C. C. activities under the Act than the word "jurisdiction."

■ In the field wherein it exercises the powers expressly given it, the findings of the I. C. C. are well-nigh conclusive. True, it may not be said that the orders of the I. C. C. are unassailable if wholly lacking in evidentiary support. But where, in matters relating to plans of reorganization, earning power of debtor, its operations, having in view the greatest service to the public and the greatest net earnings for its security holders, the findings of the I. C. C. should be, as they are, accepted almost as verities by the courts.

Turning now to the statute, what language do we find which sustains this analysis of the Act? Sec. 77, sub. a, provides among other things, "upon the filing of such a petition, the judge shall enter an order either approving it as properly filed under this section * * *. If the petition is so approved, *the court in which such order is entered shall, during the pendency of the proceedings * * * have exclusive jurisdiction of the debtor and its property wherever located."*

There can be no question but that the debtor herein filed the petition and the same was approved as being properly filed and in good faith, all as provided by Section 77 of this Act. Likewise, there can be no question but that, upon such filing and approval, the District Court was vested with *exclusive* jurisdiction of the debtor and its property wherever located. Language could hardly be more clear or emphatic. Not merely jurisdiction, but *exclusive* jurisdiction of the debtor and all of its property, wherever situated, is hereby conferred. More, not only the exclusive jurisdiction of a court of bankruptcy, but also the jurisdiction of a court of equity, were the railroad in receivership, is granted.

This express and unqualified power was conferred upon the *District Court,* and this is the most important and determinative provision of the Act so far as defining the relative powers and jurisdictions of the court and the I. C. C.

However, there are restrictions placed upon the power, but not upon the jurisdiction of the court. To illustrate—Over certain matters the court is given power to appoint one or more trustees; the appointments, however, must be approved by the I. C. C. The court determines the amount of the bond of its trustees. He can terminate any such appointment on cause shown and appoint a new or successor trustee. We assume that the second appointment is also subject to ratification by the I. C. C., although paragraph 2 of Section 77, sub. c does not expressly so provide.

The judge determines the compensation of the trustee, but again such compensation is subject to maximum limits established by the Commission. When a trustee is appointed and qualified, he has the title and exercises the power of a trustee. It is here significant that the section provides that in exercising his powers he shall be subject "to the control of the *judge*." Likewise, if authorized "by the *judge*" the powers of a receiver in an equity proceeding are conferred upon the trustee.

It is at this point of Section 77, sub. c (2) that substantial powers of the I. C. C. are

recognized. The power of the trustee to operate the business of the debtor is limited by the control of the judge *and* the jurisdiction of the I. C. C. as provided by Chapter 1, of Title 49, U.S.C.A. § 1 et seq., as of August 27, 1935 or as thereafter amended. It is this review of the court's control to which we refer as evidencing the wise intent of Congress not to disturb the provisions of the Interstate Commerce Act, which for nearly sixty years has evidenced the settled policy of Congress in its regulation of railroads engaged in interstate commerce.

Sec. 77, sub. c (3), gives to the court further jurisdiction and power, namely, to issue certificates, binding on debtor's estate, in order to obtain cash or property, and here again, the court's power is limited by the provision which calls for the approval of the Commission.

Sec. 77, sub. c (4) and (7) gives the court authority to require the officers of the debtor, or the trustee, to file schedules and to submit information concerning the debtor's property and to fix reasonable time within which claims of creditors may be filed. These provisions follow the general bankruptcy act rather closely.

Subsections (11) and (12) are both rather significant. Here the authority of the Commission to act and to take a leading role in the *reorganization* of the debtor is apparent. The I. C. C. may direct its agencies to file such reports or data in reference to business earnings, the financial set-up of the debtor, etc., as may be helpful to the parties and the creditors in preparing reorganization plans.

Coming more closely to the question before us, we find subsection (12) which provides that

"Within such maximum limits as are fixed by the Commission, the Judge may make an allowance, to be paid out of the debtor's estate, for the actual and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceedings and plan by parties in interest and by reorganization managers and committees or other representatives of creditors and stockholders, and within such limits may make an allowance to be paid out of the debtor's estate for the actual and reasonable expenses incurred in connection with the proceedings and plan and reasonable compensation for services in connection therewith by trustees * * *. Appeals from orders of the court fixing such allowances may be taken to the circuit court of appeals independently of other appeals * * *. The Commission shall, at such time or times as it may deem appropriate, after hearing, fix the maximum allowances which may be allowed by the court pursuant to the provisions of paragraph (12) of this subsection (c) and, after hearing if the Commission shall deem it necessary, the maximum compensation which may be allowed by the court pursuant to the provisions of paragraph (2) of this subsection (c)."

Subsection (13) authorizes the judge "on his own motion or at the request of the Commission [to] refer any matters for consideration and report, either generally or upon specified issues, to one of several special masters who shall have been previously designated to act as special masters in any proceedings under this section by order of any circuit court of appeals and may allow such master a reasonable compensation for his services and actual and reasonable expenses." Somewhat exceptional is the provision that these special masters be appointed by the Circuit Courts of Appeals.

■ Our conclusion is that the jurisdiction—and the exclusive jurisdiction—of all matters relating to the estate of the debtor is in the court. Also, that the I. C. C. has a most important function to perform—that of preparing the data, studying the same, and finally recommending a plan of reorganization, which must, however, be ultimately approved by the court. To give it legal effect, the court must act judicially. In some matters the I. C. C. acts as a master who hears and makes findings. In other matters, it exercises a veto power on the District Court.

■ A railroad debtor's petition, under Sec. 77 of the Bankruptcy Act, contemplates a reorganization. That is the gist of the litigation, the heart of the petition, if it may be so called. To equitably adjust debts of the debtor, provide priorities to creditors, make provision for its future successful operation—these are the objects sought by the debtor railroad when it comes into court under Sec. 77 of the Bankruptcy Act.

It seems to us crystal clear that in order to carry this out the debtor must apply to the court which has not a divided, but an exclusive jurisdiction over it and its property. However, as to a most important function connected with the reorganization, it is provided that the I. C. C. shall render assistance. This is obviously due to its

experience and greater familiarity with matters which are determinative of a just and fair reorganization. The reasons for the debtor's failure and ways of avoiding financial breakers in the debtor's future should be best known to the I. C. C. Its assistance can hardly be over-estimated by a court whose many other duties make it difficult to go into the statistical reports of earnings and expenses as well as the operating problems of a railroad extending through vast sections of the country.

Secondary to this main purpose of the Act which was to give to the railroad an opportunity to reorganize, is the purpose of Congress to prevent extravagance and to avoid delays in consummating this object. Desirous of assisting the courts in preventing excessive costs and great delays, there run through the act, provisions respecting maximum amounts which may be paid to those appointed by the court to serve it. Likewise, to further assist the court Congress provided that the special masters should be named by the Circuit Courts of Appeals.

■ Applying all this to the particular facts in the case before us, we are persuaded that the order of the I. C. C. made upon the application of the debtor and the common and preferred stockholders, is not reviewable by the District Court, save perhaps when there is a total lack of evidence to support the order made by the I. C. C.[2]

■ The petition which was addressed to the District Judge was not merely to set aside the order of the I. C. C. which declined to authorize the costs of printing the record on appeal, but it contained a petition to the court to act on its own jurisdiction and make the authorization. This part of debtor's petition had no reference to the order of the I. C. C. It asked the court to exercise its jurisdiction and, in its discretion, permit the aggrieved parties to appeal at debtor's expense (so far as printing the record on appeal).

As we read and construe the memorandum of the District Court, the petition was not denied on its merits. The court intimated, if it did not say, that it would make the order if it had authority so to do. We think the court had the authority.

We do not say that the court should grant or deny the petition. On this question we do not now pass. We merely hold that it was within the court's power to act and to allow, if the facts warranted it, out of the estate of the debtor, the amount necessarily required for printing the record on appeal.

This authority is not controlled by Sec. 77, sub. c (12), which provides for payment out of the debtor's estate of actual and reasonable expenses, including reasonable attorney's fees incurred in connection with the proposed plan or plans by parties in interest and by reorganization managers and committees or other representatives of creditors and stockholders, in which case the I. C. C. must determine the maximum allowances. Abrams v. Scandrett et al., 7 Cir., 121 F.2d 371, decided by this court May 20, 1941.

■ Appellant's appeals do not fall in the class designated by this subsection (12). To determine its application or nonapplication we must have the facts. They are: The plan, finally recommended by the I. C. C. and adopted by the court, eliminated all stockholders, common and preferred, from participation in the new company. They were completely out. Obviously, a plan of reorganization which entirely eliminated any security holders whose rights before that plan was adopted were clear, and which provides that the said eliminated security holders *should not appeal,* could not be sustained. They must be given the right to review such plan either by appeal or otherwise.

■ The wise exercise of the court's power to authorize the payment of expenses out of the estate in its custody, will depend upon the facts of each case. The court is charged with the duty of protecting all security holders of the debtor whose property has been transferred to its jurisdiction. This includes stockholders as well as creditors. The possession and management of debtor's property is in the court. The court's power to take from any security holder (here the stockholder) all

---

[2] The method of review presents a question not necessary for us to decide, which is, How shall such an order by the I. C. C. be reviewed? By the court as in case of a review of an order made by a master? Or by an independent suit in any court of competent jurisdiction? That I. C. C. actions are reviewable seems to us quite clear, but where and how is a more difficult question, which is passed because not directly involved in this appeal.

of its rights is unusual, and exists only because of the provision of the Constitution which gives to Congress the power to legislate on the subject of bankruptcy (and bankruptcy necessarily involves the impairment, and even abrogation of the rights of all security holders).[3]

A court should hesitate before denying to the parties whose rights are thus cut off, the right to review its order by appeal. On the other hand, the court must give heed to the fact that where the debtor's property is insufficient to pay the debts and obligations of the debtor, the stockholder *has no interest* in the debtor's estate.[4] His interest is nil. He is as much a stranger as if he had never held the stock. The fact that stockholders have lost their investment, in no way affects the question. Distressing as may be the loss to the investor, the statement that the "stockholders invested their life savings" is no more persuasive or worthy than to contend that plaintiff, having lost his leg or his arm in an automobile collision, is entitled to recover from some one.

If the stockholders have no interest in the debtor, due to its failure to show assets sufficient to pay its debts, then, the court would be unwarranted in taking funds, belonging to the creditors, but inadequate to pay all creditors' claims in full, and permit stockholders to prolong the litigation and increase the costs and expenses of administering the debtor's estate. To do this would be to place a premium on the efforts of those who are capitalizing on nuisance value, and no premium should be placed on the efforts of those who specialize in creating nuisance values. Their ingenuity, panurgy and persistence need no encouragement.

We do not possess the District Court's information respecting the size and value of the debtor's estate, its earnings, now, or in the past, or the amount of the outstanding and valid claims of creditors. Moreover, we are confronted by a question of the District Court's power, as yet unexercised. Until that court acts, we are not in a position to pass upon its judgment. Nothing we have said, or could say, would bear on the advisability or propriety of the District Court's exercising its discretion in favor of, or against the petitioner. This is a discretion which is lodged in the District Court subject, of course, to the above stated rules and holdings which control or influence the wise exercise of such discretion.

It is readily apparent why the Congress provided that the Commission should fix the maximum limit for compensation and expenses of attorneys and committees who rendered services before it, and left to the court full discretion in matters relating to appeals and all other matters concerning the value of which the Commission had no special knowledge. Equally persuasive with us is the fact that Congress would hardly have provided for the lodgment in the I. C. C. of authority to submit and adopt a plan of reorganization and, at the same time, place in the same body the power to prevent security holders whose rights were abrogated, from effectively prosecuting an appeal therefrom. Far more natural and logical would be the location of the power which permitted the District Court, which is not so directly responsible for the plan, to allow the stockholders who have lost their entire holdings in the company to prosecute an appeal and to authorize out of the debtor's estate, a payment of the printing bill on said appeal.

The last sentence of subsection (12) confirms this view. It provides that the "Commission shall * * * *after hearing,* fix the maximum allowances which may be allowed by the court." How could there be a hearing on the reasonableness of services not yet rendered? This language contemplated only allowances for services or expenses that have been rendered, not for those which will be rendered.

The precise question is whether a court, having jurisdiction of the debtor, and to put into effect a plan of reorganization which eliminates all holders of the debtor's stock, may not authorize, for the purpose of testing the validity of the plan, the costs of printing the record on appeal, out of the debtor's estate.

In the absence of express statutory denial of authority, we hold that a court having the exclusive jurisdiction of the debtor and the debtor's estate, and having the power and jurisdiction of a court of bankruptcy and, also, of a court of equity

---

[3] In re Chicago, R. I. & Pac. Rd. Co., 7 Cir., 72 F.2d 443; In re Prima Co., 7 Cir., 88 F.2d 785, 788, 116 A.L.R. 766.
[4] In re 620 Church Street Bldg. Corp., 299 U.S. 24, 57 S.Ct. 88, 81 L.Ed. 16; Case v. Los Angeles Lumber Co., 308 U.S. 106, 126, 60 S.Ct. 1, 84 L.Ed. 110.

in a suit where a receiver has been appointed, possesses that power.

██ If subsection (12) does not limit the court's jurisdiction, then clearly there is no other statutory limitation of its powers. At most, subsection (12) is but an implied limitation on the court's power. It is not a limitation on the court's jurisdiction of the subject-matter. The limitation is in reference to services which *have been* rendered by the parties in interest and by committees or other representatives of creditors. The services therein referred to, *have been rendered.* For the greater part they were rendered by the parties before the I. C. C. They deal with services rendered and expenses incurred in submitting the plan of reorganization before the I. C. C. They do not refer to services to be performed or expenses to be incurred in the future. Of the necessity and reasonableness of future services and expenses, the trial court, rather than the I. C. C., is the best judge. Moreover, the jurisdiction is in the court, unless taken from it and placed in the I. C. C. by this subsection of the statute.

The order entered in No. 7657, denying debtor's petition for order directing the I. C. C. to fix maximum limits to be paid out of the debtor's estate in connection with the appeals by the debtor, is affirmed.

The order entered in No. 7656, denying debtor's petition for order making allowance out of debtor's estate to cover costs of printing record and briefs in the Circuit Court of Appeals, is reversed, with costs, with directions to the District Court to hear and pass upon the petition of appellant, which petition asks that the court direct the cost of printing of record on appeals which have been taken by the debtor, be paid by the trustee out of the assets of said debtor.