In the Matter of CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, Debtor-Cross-Appellee.

William GIBBONS, Trustee-Appellant, Cross-Appellee,

v.

ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, et al., Intervenors-Appellees, Cross-Appellants,

Interstate Commerce Commission, Cross-Appellant.

Nos. 75–1738 to 75–1741.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1976.

Decided July 1, 1976.

Rehearing Denied Aug. 3, 1976.

Norman H. Nachman, Nicholas G. Manos, Martin L. Cassell, Chicago, Ill., for Chicago, R. I. & P. R. Co.

Martin M. Lucente, Chicago, Ill., for Atchison, Topeka & Santa Fe.

Charles H. White, Jr., Atty., Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Before HASTINGS, Senior Circuit Judge, SWYGERT, Circuit Judge, and EAST, Senior District Judge.*

HASTINGS, Senior Circuit Judge.

The Chicago, Rock Island and Pacific Railroad Company filed a petition for reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205, on March 17, 1975. William Gibbons was appointed trustee by the reorganization court, and his appointment was approved by the Interstate Commerce Commission. The Atchison, Topeka and Santa Fe Railway Company, and 22 other interline railroads, were granted leave to intervene in the reorganization proceedings.

Section 77 proceedings contemplate the continued operation of the bankrupt railroad by the trustee pending adoption by the Interstate Commerce Commission of a reorganization plan generally acceptable to shareholders, creditors and the court. Railroad operations during the reorganization period remain subject both to the supervision of the reorganization court and to the jurisdiction of the Commission. At issue in this appeal are certain orders of the court governing the Rock Island's operation during this reorganization period prior to the adoption of the reorganization plan.

The orders here in issue concern the trustee's payment and collection of various interline accounts maintained between the Rock Island and the intervening railroads. Interline accounts are kept by the nation's railroads in order to allocate the costs and revenues from certain joint operations and to account for amounts owed as a result of

---

* The Honorable William G. East, Senior United States District Judge for the District of Oregon, is sitting by designation.

various mutual services which all railroads must provide for each other on a regular basis. All railroads keep accounts which cover through service in passengers and freight, switching, loss and damage, overcharge, trailer rentals, car repair, and per diem.

The interline railroads and the Interstate Commerce Commission appeal from the ruling of the reorganization court governing the trustee's payment of the per diem interline account. The trustee appeals from the ruling of the reorganization court governing the trustee's collection of interline accounts generally. We consider each ruling, and the facts relevant thereto, *seriatim*.

## I.

We first consider the reorganization court's ruling that it had the power to permit the trustee, within his discretion, to defer payment of amounts owed by the Rock Island on pre-reorganization per diem accounts. The interline railroads and the Commission appeal from that decision. We reverse.

The per diem account represents charges which each railroad must pay for the use of another railroad's cars. The Commission has statutory authority to comprehensively regulate all aspects of car service to assure both adequate supply and efficient allocation of the national pool of rail cars.[1] Under that authority, it has set mandatory per diem rates and has adopted mandatory rules governing the settlement of per diem accounts. Per diem charges include a "basic per diem" rate paid by the car-user to the car-owner to compensate the car-owning railroad for the average cost of purchasing and maintaining its cars.[2] The Commission has also adopted an "incentive per diem" charge which operates to encourage the prompt return of equipment found to be in short supply.[3]

Since 1930, the Commission has adopted and made mandatory the rules of the Association of American Railroads (AAR) governing the settlement of per diem accounts.[4] These per diem rules provide for each railroad to supply a monthly statement within forty days of the end of each calendar month, setting out the number of days each car has been in its possession during that month. This statement is forwarded to the car-owning road, which may make an immediate draft for any amount in its favor after subtracting the amount which it, in turn, owes the other carrier for use of its cars.

In the instant reorganization proceedings, the trustee's payment of interline accounts, including per diem accounts, is governed by the court's Order No. 1 as substantially modified by its Order No. 7. Order No. 1, entered on March 17, 1975, authorized the trustees to pay all interline accounts, but did not require him to do so. That provision was amended by Order No. 7, entered on April 9, 1975. The amended order required the trustee to pay all interline freight and passenger accounts. It further required payment of interline accounts, other than passenger and freight, presented for payment or due to be stated under AAR rules *after* May 1, 1975. With respect to per diem, these "post-reorganization" accounts represented the Rock Island's car use after the filing of its reorganization petition. Those interline accounts, other than passenger and freight, presented for payment or due to be stated *before* May 1, 1975, could be paid or deferred at the discretion of the trustee. These "pre-reorganization" per diem accounts are accounts presented for payment during the reorganization period for car use before the reorganization petition was filed.

Pursuant to these orders, all post-reorganization interline accounts have been paid regularly under normal procedures, as have

1.  Interstate Commerce Act, 49 U.S.C. §§ 1(10)–(17).

2.  *Chicago B. & Q. R.R. v. New York, S. & W. R.R.*, 332 I.C.C. 176 (1968).

3.  *Incentive Per Diem Charges–1968,* 337 I.C.C. 183, 217 (1970).

4.  *Rules for Car-Hire Settlement,* 160 I.C.C. 369, 165 I.C.C. 495 (1930).

passenger and freight accounts for both the post-reorganization and pre-reorganization periods. The trustee, however, has declined to pay at this time the other pre-reorganization interline accounts, including the per diem account, for the months of January, February and March 1975. Payment of these accounts is within the trustee's discretion under the applicable court orders. The interline railroads have acquiesced in the deferred payment of all pre-reorganization interline accounts *except* the per diem account.

On April 25, 1975, the interlines petitioned the reorganization court to modify its Orders Nos. 1 and 7 to require mandatory payment by the trustee of all pre-reorganization per diem accounts. This petition was supported by a memorandum of the Interstate Commerce Commission. The interline railroads and the Commission contended that ICC regulations governing the amount, manner and timing of settlement of per diem accounts could not be overruled or modified by the reorganization court. The court rejected this argument and denied the interlines' petition. Memorandum Opinion and Order, June 23, 1975 (Unreported). The court concluded that, although ICC regulations conclusively establish the existence of the pre-reorganization per diem debt, the court, under its general powers in a bankruptcy proceeding, could establish the priority of that debt in relation to other debts incurred by the Rock Island prior to filing its reorganization petition. The court thus declined to modify its order leaving to the trustee's discretion whether to pay pre-reorganization per diem accounts or to postpone payment pending a determination of priority among creditors.

The appeal of the interline railroads and of the Commission from that decision presents a conflict between the statutory authority of the reorganization court and that of the Commission over the affairs of a railroad in Section 77 reorganization.

The trustee, in support of the decision of the reorganization court, relies on those provisions in Section 77 which establish the authority of the reorganization court over the determination of rights and liabilities of creditors. Section 77(a) confers on the court exclusive jurisdiction over the debtor railroad and its property and grants the court all powers over that property traditionally exercised by an equity receiver. Section 77(*l*) grants the court the jurisdiction and power of an ordinary bankruptcy court to the extent that grant is not inconsistent with the provisions of Section 77. Section 77(b) makes expressly applicable Section 60 powers to avoid preferential transfers. Section 77(c)(7) provides for the court to determine provable and allowable claims and classes of creditors and shareholders.

The broad power of the reorganization court in matters affecting the claims of creditors is essentially undisputed. In *In re Chicago & North Western Railway Co.,* 7 Cir., 121 F.2d 791 (1941), we resolved a conflict between the authority of the Commission and that of the reorganization court, stating:

> To equitably adjust debts of the debtor, provide priorities to creditors, make provision for [the railroad's] future successful operation—these are the objects sought by the debtor railroad when it comes into court under Sec. 77 of the Bankruptcy Act. * * * [I]n order to carry this out the debtor must apply to the court which has not a divided, but an exclusive jurisdiction over it and its property.

*Id.* at 797. The trustee contends that the pre-reorganization per diem accounts merely represent a debt which the Rock Island owed to creditor railroads at the time it filed its petition and that control over payment of the debt is within the authority which the reorganization court exercises over the estate of the debtor and the pre-reorganization claims of creditors.

The interline railroads and the Commission, however, contend that payment of per diem accounts is controlled, not by provisions governing claims of creditors, but rather by provisions governing the operation of the railroad in reorganization. They rely on Section 77(c)(2) which provides that

during the reorganization period the trustee has the power to operate the business of the debtor railroad "subject to the control of the judge *and the jurisdiction of the Commission.*" (Emphasis added.) 11 U.S.C. § 205(c)(2). This provision recognizes that a railroad operating in reorganization remains subject to applicable Commission orders.[5] A reorganization court is without power to exempt a railroad in reorganization from compliance with those orders. *In re Lehigh Valley Railroad Co.,* 3 Cir., 508 F.2d 332, 338 (1975). *See also Palmer v. Massachusetts,* 308 U.S. 79, 86–7, 60 S.Ct. 34, 84 L.Ed. 93 (1939);[6] *New Haven Inclusion Cases,* 399 U.S. 392, 431, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

It is apparent that the competing statutory provisions relied on by the parties merely represent the multiple, and at times conflicting, purposes which Section 77 is designed to achieve. The trustee's position and the statutory authority which he cites promotes two traditional bankruptcy goals: rehabilitation of the debtor and equitable distribution of available assets to creditors. The Commission, on the other hand, relies on statutory provisions indicating Congressional intent to harmonize Section 77 proceedings with the comprehensive regulation of national rail transportation which the Commission administers.[7] Thus the trustee argues that immediate payment of pre-reorganization per diem accounts will severely burden the Rock Island's already distressed financial condition and unfairly benefit the interline railroads at the expense of the Rock Island's other creditors. The Commission argues that deferred payment of per diem accounts will undermine a finely balanced regulatory scheme, force other railroads (some of which are themselves financially troubled) to subsidize the Rock Island's operations, and exacerbate an already severe national rail car shortage.

■ We are not persuaded that any language in the statute itself clearly indicates which policy and which authority is to predominate in the situation before us. It is our conclusion, however, that in view of the comprehensive regulation by the Commission of all aspects of car service and the key role which rules for settlement of per diem accounts play in that regulatory system, the payment of per diem accounts for both post- and pre-reorganization periods is properly considered as part of the operation of the railroad in reorganization under Section 77(c)(2) and is consequently governed by Commission orders.

We recognize that the pre-reorganization per diem accounts do represent a claim against the debtor's estate and in that sense constitute a "debt" within the meaning of the Bankruptcy Act.[8] However, several factors persuade us that the reorganization court's power in determining the priority of that claim in relation to claims of other creditors has been circumscribed by the su-

**5.** See also Interstate Commerce Act, 49 U.S.C. § 1(17)(a), which provides with respect to ICC regulation of car service: "[I]n case of failure or refusal on the part of any carrier, *receiver, or operating trustee* to comply with any such order or direction such carrier, *receiver,* or *trustee* shall be liable to a penalty of not less than $100 nor more than $500 for each such offense . . . ." (Emphasis added.)

**6.** Justice Frankfurter, writing for the Court in *Palmer* considered the Commission's role in these proceedings to be a safeguard of the public interest. He wrote:

[T]he long history of federal railroad receiverships, with the conflicts they frequently engendered between the federal courts and the public, left an enduring conviction that a railroad was not like an ordinary insolvent estate. Also an insolvent railroad, it was realized, required the oversight of agencies specially charged with the public interest represented by the transportation system. Indeed, when, in the depth of the depression, legislation was deemed urgent to meet the grave crisis confronting the railroads, there was a strong sentiment in Congress to withdraw from the courts control over insolvent railroads and lodge it with the Interstate Commerce Commission. Congress stopped short of this remedy. But the whole scheme of § 77 leaves no doubt that Congress did not mean to grant to the district courts the same scope as to bankrupt roads that they may have in dealing with other bankrupt estates. 308 U.S. at 86–7, 60 S.Ct. at 38.

**7.** *See* Collier on Bankruptcy ¶ 77.02, at 469, 471 (14th ed. 1976).

**8.** *Cf.* 11 U.S.C. § 1(14).

perseding authority of the Commission in this area.

The Commission has argued before our court that the relationship between interlines with respect to car hire is more that of copartners than of debtor and creditor. In its decisions the Commission has treated per diem accounts as a statutorily required sharing of the costs of maintaining an adequate national car pool. *Chicago, Burlington & Quincy Railroad Co. v. New York, Susquehanna & Western Railroad Co.,* 332 I.C.C. 176 (1968). *See United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 743, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). Basic per diem rates provide no profit to the car-owning road and are assessed even when the user derives no benefit from its use of the car. *Chicago B. & Q. R.R.,* 332 I.C.C. at 186. In its decision setting basic per diem rates, the Commission stated:

> There is sound reason why these per diem charges should constitute no more than a sharing of cost. We are not concerned with the problem of calculating proper charges to customers of the respondents, but with the assignment among a group of carriers engaged in multitudinous joint ventures, of the burden of acquiring and maintaining the vehicles used by all. Not only is their use compulsory on the paying line but a great deal of the use which is made and for which charges are paid is not productive of revenue to the user.

*Id.* at 187–8. The goal of equitable cost-sharing of a common pool of rail cars can be achieved only through uniform observance of per diem charges. *Id.* at 258; *Incentive Per Diem Charges,* 349 I.C.C. 303 (1975); *see also Chicago, Rock Island & Pacific Railway Co. v. United States,* 284 U.S. 80, 100, 52 S.Ct. 87, 76 L.Ed. 177 (1931).

■ Moreover, the Commission has found it necessary not only to prescribe per diem rates for car hire but also to prescribe precise rules for the settlement of per diem accounts. The per diem account differs in this respect from the other interline accounts for which the trustee has deferred payment in these proceedings. No mandatory Commission orders regulate the settlement of those accounts. However, with respect to the per diem account, the Commission's adoption of the AAR per diem rules expressly requires payment of per diem accounts to be made at the time and in the manner prescribed by those rules. Based on our reading of applicable Commission orders, we cannot adopt the reorganization court's view that the Commission's per diem orders merely govern the creation of the per diem debt.

■ In view of the mandatory nature of Commission orders governing the settlement of per diem accounts, we conclude that the trustee must pay these accounts as they become due in accordance with the per diem rules. We do not accept the reorganization court's distinction with respect to the per diem accounts between those accounts which represent pre-reorganization car use and those which represent post-reorganization car use. Since Commission orders prescribe the *time* and *manner* of payment, the trustee is in *current* violation of Commission orders governing all operating railroads when he refuses to pay per diem accounts which become due during the reorganization period. Section 77(c)(2) requires the trustee in operation of the railroad prior to adoption of the reorganization plan to comply with all orders of the Commission. It is clear to us that this provision requires compliance with Commission orders setting mandatory rules for the settlement of per diem accounts.

We have considered the Commission's contention that a contrary result would substantially disrupt the Commission's regulation of car service, especially if the number of major railroads in reorganization continues to increase. The Commission has called our attention to the existence of a severe national rail car shortage [9] and the impor-

---

9. The problem of a national car shortage has been acknowledged in decisions of the Supreme Court. *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *United States v. Florida East Coast Ry.,* 410 U.S. 224, 230, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). *See generally Note: The Freight Car Shortage and ICC Regulation,* 85 Harv.L.Rev. 1583 (1972).

tance of uniform application of per diem rules in the Commission's attempted solution to that problem. As the Commission points out, by avoiding payment of pre-reorganization per diem accounts under the Commission's uniform accounting rules, railroads in reorganization could undermine attempts to increase supply and improve allocation of the national rail car fleet. Other railroads, many of which are themselves financially troubled, would be forced in effect to subsidize the bankrupt lines for their pre-reorganization car use. Since basic per diem rates cover only an average cost of car ownership, nonpayment by bankrupt roads would result in a failure to compensate car-owning roads for the full costs of car ownership. This would tend to discourage rather than encourage car ownership and would consequently thwart recent Congressionally mandated attempts to increase car supply.[10] It appears to us that Section 77, by providing for Commission involvement in every aspect of reorganization proceedings and by preserving Commission authority over the operation of the bankrupt railroad, is designed to effect reorganization without undermining or disrupting administrative regulation of the national rail system.

Our conclusion in this case departs to some extent from the holding of the Third Circuit in *In re Penn Central Transportation Co.,* 3 Cir., 486 F.2d 519 (1973), *cert. denied,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). However, a reading of the court's decision in that case indicates that the argument urged before our court was not similarly presented in those proceedings. The court held in *Penn Central* that under traditional trust principles, pay-

ment of amounts showing in pre-reorganization interline passenger and freight accounts collected by Penn Central on behalf of the interline railroads could not be deferred by the trustee. However, deferred payment of other pre-reorganization interline accounts, including per diem, was held to be permissible at the discretion of the reorganization court. It appears that no attempt was made in those proceedings to distinguish the per diem account from other interline accounts. The court relied in part on its finding with respect to all interline accounts, other than passenger and freight, that "[d]espite the legal obligation to perform the services, there is no compulsion, statutory or otherwise, as to the manner by which the services shall be paid. Arrangements for payment or credit are voluntary." *Id.* at 528. In fact, as we have emphasized in our decision, the Commission has set *mandatory* rules for settlement of per diem accounts.

■ Nor do we find the reasoning in that case controlling in resolving the question here before us. The result in *Penn Central* was reached by an application of trust principles. It is conceded in this case that trust principles do not require immediate payment of the pre-reorganization per diem accounts. While the existence of a trust relationship may require payment of passenger and freight accounts, as the court found in *Penn Central,* it is not conversely true that, in the absence of a trust relationship, payment of per diem accounts is *not* required.[11] We view the question before us as essentially a question of statutory construction and have resolved it upon a consideration of the applicable provisions of Section 77 and the policies they represent.

---

10. Congress in 1966 sought to deal with the problem by amending the Interstate Commerce Act, 49 U.S.C. § 1(14)(a) to broaden the Commission's authority over car service. That amendment requires the Commission in the regulation of car service to consider "factors affecting the adequacy of the national freight car supply" and authorizes the Commission to introduce an incentive element in per diem rates. *See* 1966 U.S.Code, Cong. & Admin. News, at 2227–30.

11. We note that Judge Adams, concurring in the *Penn Central* decision, cautioned against drawing negative inferences from the court's trust rationale. 486 F.2d at 532–3. He further suggested that decisions concerning payment of interline accounts under Section 77 be based on a consideration of "pragmatic factors" and "Congressional pronouncements." *Id.* at 531.

We do not believe that our reasoning or the result we have reached is in conflict with the decision of the Third Circuit.

We conclude that the reorganization court erred in its order permitting the trustee to defer payment of pre-reorganization per diem accounts. We therefore reverse the decision of the reorganization court denying the interlines' petition to modify its orders governing the trustee's payment of per diem accounts.

## II.

We next consider the ruling of the reorganization court limiting the trustee in the collection of pre-reorganization interline accounts to the outstanding net balance, if any, in the Rock Island's favor. The trustee appeals from that ruling. We affirm.

We are concerned here with the settlement of pre-reorganization accounts between the Rock Island and the interline railroads covering switching, loss and damage, overcharge, trailer rentals, and car repair.[12] Settlement of these accounts is ordinarily made pursuant to rules promulgated by the Association of American Railroads, which are binding on all members of that association, including all railroads involved in these proceedings.[13] Under the AAR Accounting Rules, information about the various transactions and services for which interline accounts are kept is exchanged for each account on a monthly basis. The carrier with a net balance in its favor in any account upon exchange of reports may thereafter present the other carrier with a

draft for that amount. AAR rules provide for monthly settlement on a net balance basis for all the interline accounts with which we are here concerned.

Under the discretion conferred by applicable orders of the reorganization court, the trustee declined to honor at this time drafts presented by the interline railroads for net balances owed by the Rock Island on the relevant pre-reorganization interline accounts. The trustee, at the same time, was authorized and directed by court order "to collect all outstanding interline and other accounts owing to the Debtor." (Order No. 1, March 17, 1975.) In reliance on this authority, the trustee submitted drafts to the interline railroads not for the net balances for which settlement is ordinarily made under AAR rules but rather for the gross credits in the Rock Island's favor in each of the pre-reorganization interline accounts here in issue.

The interline railroads refused to pay this gross amount, claiming that pursuant to AAR Accounting Rules the trustee was entitled to collect only any net balance which might exist in favor of the Rock Island in an individual interline account. The court's Order No. 7 expressly required compliance during the reorganization proceedings with all existing rules and procedures of the AAR. The trustee, however, maintained that the drafts for gross credits were proper under governing court orders and that any netting of interline balances prior to collection by the trustee would violate the general order of the reorganization court which prohibited offsets by creditors.[14]

---

**12.** Under the court's Order No. 1 as modified by Order No. 7, the settlement of all passenger and freight accounts is not affected by the reorganization proceedings, nor is the settlement of those accounts covering the Rock Island's post-reorganization operation. Under the holding of this court as set out in Part I of this opinion, the per diem accounts for both pre- and post-reorganization periods are also to be settled at the time and in the manner prescribed by AAR rules as adopted by the Commission.

**13.** The accounting procedures followed by the interline railroads in the settlement of interline accounts are set out in the affidavit of J. M. Johnson, submitted to the reorganization court

in support of the interlines' April 25, 1975, petition to modify the court's orders.

**14.** The court's Order No. 1 as modified by Order No. 7 provided in relevant part:

[I]t is ORDERED [that] * * *
10. All persons, firms and corporations * * * holding for the account of the Debtor deposit balances or credits or interline balances be and each of them hereby are restrained and enjoined * * * from offsetting the same, or any thereof, against any obligation of the Debtor, until further order of this Court. The restraint against offset against any obligation of the Debtor * * * shall be effective * * * notwithstanding

The interline railroads petitioned the reorganization court on April 25, 1975, to instruct the trustee in the collection of the pre-reorganization accounts for which payment by the trustee was properly deferred to present drafts only for the favorable net balance, if any, showing in each account and not for the gross credits in the Rock Island's favor. The trustee cross-petitioned for enforcement of the court's order prohibiting the offset of interline accounts as he interpreted it. In its Memorandum Opinion and Order of June 23, 1975, the court granted the interlines' petition and denied the cross-petition of the trustee. The trustee was thus prohibited from presenting drafts for the gross credits in favor of the Rock Island on pre-reorganization interline accounts. On July 23, 1975, the court entered Order No. 19, supplementing its earlier prohibition against offsets by expressly excluding the netting of interline accounts from that prohibition.

█ In determining the application of its prohibition against offsets to the trustee's collection of pre-reorganization interline accounts, the court concluded that the AAR Accounting Rules governing the settlement of interline accounts establish "mutual open accounts." The court cited the following definition of a mutual open account:

> If there are items debited and credited on both sides of an account and not simply a series of transactions resulting always in a debit so far as one of the parties is concerned and a credit insofar as the other party is concerned, the account is called a 'mutual open account'. A mutual account arises where there are mutual dealings and the account is allowed to run with a view to an ultimate adjustment of the balance. There must be one account on which the items on either side belong and on which they operate to extinguish each other pro tanto, so that *the balance*

any provisions to the contrary contained in the Railway Accounting Rules published by the Association of American Railroads.

**15.** The interlines have cited numerous cases which set out the characteristics of a mutual open account. *See, e. g., In re Vicen's Estate,* 1 Wis.2d 193, 83 N.W.2d 664, 667 (1957), where

*on either side is the debt between the parties.* It is not enough that the parties should have cross demands, or cross open accounts; there must be a mutual agreement, express or implied, that the claims upon the one side and the other side are to be set off against each other. * * * (Emphasis added.)

1 Am.Jur.2d, *Accounts and Accounting* § 5, at 374–5 (1962). It is clear from this definition, and the trustee does not seriously dispute, that under the agreement of the railroads to the AAR Accounting Rules, the interline accounts are properly characterized as mutual open accounts. According to that definition, one feature of a mutual open account is that day-to-day debits and credits are mutually extinguished automatically so that at any point in time the debt owed on the account consists only of the outstanding net balance.[15] Based on the character of the interline accounts as mutual open accounts, the reorganization court concluded that it was without power to prohibit those daily "offsets" which occur automatically within each account and that the trustee consequently was limited to collection of only the net balances which might exist in the Rock Island's favor.

The trustee challenges the decision of the reorganization court on two grounds. He first contends that the offsets within pre-reorganization interline accounts actually occurred when the accounts were presented for settlement after the filing of the reorganization petition and that they were consequently in direct violation of the court's order entered on the day the petition was filed prohibiting post-petition offsets. This contention is based on the trustee's mistaken belief that the netting of interline accounts occurs only when information is exchanged for monthly settlement. In fact, as described by the reorganization court, the key characteristic of the interline

the court held that a mutual open account is "kept open and subject to a *shifting balance* as additional related entries of debits and credits are made thereto, until it shall suit the convenience of either party to settle and close the account." (Emphasis added.)

accounts as mutual open accounts is that there is no debt at any point of time between interline railroads other than the net balance in the account. That the parties choose to close the account for periodic settlement does not mean that the account is netted only when it is settled. (See n.15.) In fact, the account is *always* conceptually represented by a net balance; the date of settlement merely sets the time at which the existing net balance is subject to draft and payment.

█ Even accepting the view that the offsets within interline accounts occurred before the reorganization petition was filed, the trustee further contends that the court took an improperly limited view of its own authority to undo pre-reorganization transactions. However, our reading of the reorganization court's opinion indicates that its decision was not based on any restricted view of its own powers but rather on the nature of the interline accounts themselves. The court found itself to be without power to prohibit pre-reorganization "offsets" within interline accounts only in the sense that, by definition, the sole debt which exists in a mutual open account at any point of time is the net balance. There is, in effect, *no* debt for the gross credits on either side. Because of this feature of the interline accounts, the reorganization court concluded, and we agree, that the trustee's attempt to present drafts for the gross credits in favor of the Rock Island on pre-reorganization interline accounts was improper.[16]

It is our conclusion that the decision of the reorganization court which limits the trustee in the collection of pre-reorganization interline accounts covering switching, loss and damage, overcharge, trailer rentals, and car repair, to the favorable net balances in those accounts is affirmed. For the reasons set out in part I of this opinion, however, we reverse the decision of the reorganization court to the extent it permits the trustee to defer payment of pre-re-

organization per diem accounts. The cause is remanded for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART. REVERSED IN PART.

---

**16.** We also note the interline's contention, which the trustee does not dispute, that in all other reorganization proceedings, interline accounts have been settled on a net balance basis.